349 So.2d 1334 (1977)
Henry LONDON, Jr.
v.
Orrell H. RYAN, Jr., et al.
No. 11457.
Court of Appeal of Louisiana, First Circuit.
July 11, 1977.
Rehearing Denied August 24, 1977.
Writ Refused November 4, 1977.
*1336 William W. Miles, Christopher E. Lawler, New Orleans, for plaintiff-appellant Henry London, Jr.
Ben W. Lightfoot, Baton Rouge, for defendant-appellant Weaver.
Joseph F. Keogh, Baton Rouge, for defendant-appellant City of Baton Rouge.
Leon Gary, Jr., Baton Rouge, for intervenor-appellant Candace B. London.
Before ELLIS, CHIASSON and PONDER, JJ.
CHIASSON, Judge.
Henry London, Jr., plaintiff-appellant, brought this action against Orrell H. Ryan, Jr., Frederick Gernant, William L. Weaver, the City of Baton Rouge, W. W. Dumas, Mayor of the City of Baton Rouge, and Rudolph F. Radcliffe, Chief of Police of the City of Baton Rouge, defendants, to recover damages for injuries sustained as a result of being struck in the back by a bullet on December 8, 1972, at approximately 8:00 P.M., in the Rendezvous Lounge. Originally joined as defendants by the plaintiff, but voluntarily dismissed by him, were Dianne Nobles, Joe Louis Williams, and the Rendezvous Lounge.
Candace B. London, intervenor-appellant, the plaintiff's ex-wife, intervened in the suit seeking to recover one-half of any award received by the plaintiff which would accrue to the community of acquets and gains formerly existing between them.
Following a trial on the merits the District Court rendered judgment in favor of *1337 the plaintiff and against William L. Weaver and the City of Baton Rouge, appellants, in the amount of $387,650.31 plus interest and costs; in favor of the intervenor and against William L. Weaver and the City of Baton Rouge in the amount of $37,349.69; and in favor of Orrell H. Ryan, Jr., Frederick Gernant, W. W. Dumas, Mayor of the City of Baton Rouge, and Rudolph F. Radcliffe, Chief of Police of the City of Baton Rouge, appellees, and against the plaintiff and the intervenor dismissing their demands.
The plaintiff has appealed this decision contending that:
"1. The decision of the Trial Court, dismissing the plaintiff's claim against Frederick Gernant, Orrell H. Ryan, Jr., the Mayor of East Baton Rouge, and Chief of Police, Baton Rouge, Louisiana, was erroneous and contrary to the evidence presented during the trial of this matter and against the laws of the State of Louisiana.
"2. The damages awarded were so minimal as to represent an abuse of discretion on the part of the Trial Court, and should be amended so as to award Henry London all damages to which he is entitled."
The intervenor has appealed contending that:
"1. The decision of the Trial Court, dismissing the plaintiff's claim against Frederick Gernant, Orrell H. Ryan, Jr., the Mayor of East Baton Rouge and the Chief of Police, Baton Rouge, Louisiana, was erroneous and contrary to the evidence presented during the trial of this matter and against the laws of the State of Louisiana.
"2. The damages awarded herein were so minimal as to represent an abuse of discretion on the part of the Trial Judge and should be amended so as to award to Henry London and to Candace London all of the damages to which they are entitled. The allocation of the award between Henry London and Candace London should be corrected to conform to the proof at trial under the guidelines set forth by the Louisiana Supreme Court in West v. Ortego, 325 So.2d 242 (1975)."
William L. Weaver and the City of Baton Rouge have appealed contending that:
"1. The Trial Court erred in holding that William L. Weaver was guilty of negligence.
"2. The Trial Court erred in holding that Henry London, Jr. had assumed no risk and was free from contributory negligence.
"3. The Trial Court erred in failing to take into consideration the defendants ability to respond in damages when fixing the award."
The District Court in reaching its decision made the following findings of fact:
"(1) Williams was anxious for the police to arrive as he had requested the barmaids and later plaintiff to call the law.
"(2) Gernant and Ryan's unit arrived almost simultaneously with Weaver's unit and both were parked on the south side of Dayton Street about forty feet apart.
"(3) In addition to the Dayton Street door, the Rendezvous Lounge had a door which faced Scenic Highway and another door at the rear of the building.
"(4) A car was parked next to the Rendezvous and several more were within its general vicinity.
"(5) Weaver issued no instructions and gave no orders but had ample opportunity to do so had he so desired, as he was no farther than sixty feet from the south door to the Rendezvous.
"(6) Gernant was a relatively new officer with experience primarily in traffic investigation and Ryan was new and had just completed his police academy training, and the experience possessed by these officers was well known to Weaver, their supervisor.

*1338 "(7) Gernant and Ryan made no investigation as to what was transpiring inside the bar prior to converging upon the Dayton Street entrance and there was no way for those inside the bar to know of their arrival at that time.
"(8) As Gernant opened the door, he uttered words to the effect, `Police come on out,' but this warning was not heard inside the bar and there was no response from inside the Rendezvous at that time.
"(9) Joe Louis Williams, upon seeing the door open and not knowing it was the police, fired the first shot.
"(10) Gernant returned the fire with his shotgun.
"(11) Ryan then emptied his service revolver into the semi-darkness, and struck plaintiff in the back."
(Written Reasons for Judgment, pgs. 7-8).
The above findings of fact were based on testimony and evidence adduced at the trial on the merits. The Trial Judge summarized this testimony and evidence as follows:
"Some of the important facts are not disputed: Earlier in the evening of December 8, Joe Louis Williams, manager of the Rendezvous Lounge, was in an apartment behind the lounge with a girlfriend when someone whom Williams believed to be Alfred Hayes, a/k/a `Walkie-Talkie,' fired several gunshots into his apartment. A running gun battle ensued and Williams left the apartment and went inside the lounge, where more shots were apparently exchanged between the two. Williams instructed Joyce Richardson and Viola Davis, barmaids, to leave the lounge and call the police. At about the same time, plaintiff was on his way to the hospital to visit his aunt, with his cousin Mario London, and had decided to stop for a beer en route. Mario was driving and pulled up to the Rendezvous Lounge and parked near the Dayton Street entrance and waited in his car. Plaintiff went inside to get a beer to go and Williams asked him to call the police, which he did from a pay telephone near the bar. When plaintiff did not come out, Mario went in and was told what happened. In the meantime, Joyce Richardson and Viola Davis had hurried down to the Red Top Bar, which is located at Powhattan and Weller, several blocks to the south of the Rendezvous and had called the police. Officers Gernant and Ryan were patrolling in their police unit and received a dispatch to investigate a signal 45 (shooting) at the Rendezvous. When the call was received, they were near Delmont Village about ten or twelve blocks northeast of the Rendezvous on the Plank Road. The dispatch was received at approximately 7:45 p. m. Gernant was driving the unit and proceeded west to Scenic Highway and then came south on Scenic Highway. He was not familiar with the Rendezvous, passed it, and was waved down by Joyce Richardson and Viola Davis who were walking back towards the Rendezvous. He made a U-turn, went north on Scenic, and made a right turn onto Dayton Street and parked across the street from the Dayton Street entrance to the Rendezvous. At the same time, Lieutenant William Weaver, Supervisor of the Winbourne station, was also on patrol and responded to the same signal 45 and proceeded to the Rendezvous as a back-up. He parked his unit directly across Dayton Street, in a vacant service station lot near Gernant's unit. The facts which occurred after the police arrived at the Rendezvous are hotly contested.
"Weaver testified that he had heard several gunshots as he passed the front of the Rendezvous Lounge along Scenic; that as he pulled into the parking lot Gernant and Ryan pulled up onto Dayton Street and went to the south door of the Rendezvous; that Ryan was carrying a .38 Special and Gernant had a shotgun; that neither his unit nor Gernant's unit arrived with sirens on or bubble lights flashing; that he heard no gunshots after he parked his vehicle; that he heard Gernant say, `Police open up;' that he heard no response to Gernant's *1339 command; that as Gernant opened the door a shot was fired from the inside of the building; that the officers returned fire; that he was standing by a fence in line with the south door about sixty feet from Gernant but never issued an order to either of them, notwithstanding the fact that Gernant looked back to him before he opened the door; that he saw the flash from the bullet which came from the bar and which then went through a window in the service station, triggering a burglar alarm; that when the shot came from the bar, he started toward the front door, which was on Scenic Highway and went through the outside door and into the vestibule which had swinging doors; that he was familiar with the layout of the Rendezvous because he had been there before; that he peered through the swinging doors, observed a black male at the end of the bar and ordered him out of the building and was told, `I'm out of shells;' that he found a .357 Magnum pistol under the bar; that he then heard someone say, `Somebody help me, I'm shot,' and it was plaintiff lying on the floor with a chair on top of him.
"Frederick Gernant testified that he had been on the police force for two years; that was trained primarily in traffic investigation but after he had been assigned to the Winbourne substation, had handled both traffic and criminal matters; that it took him about three to five minutes to get to the scene after receiving the dispatch; that he heard shots coming from the vicinity of the bar as he was driving south on Scenic Highway; that he saw Weaver as he parked and knew he was there; that he saw no cars on Dayton Street or pedestrians when he stopped; that he got out on the driver's side of his car; grabbed his hat and shotgun and approached the Rendezvous south door which was closed; that Ryan was coming from behind him; that he heard no more gunshots after he stopped his vehicle; that as he opened the door, he announced, `Police come out with your hands up;' that as he peered around into the doorway a shot rang out and he could see its flash; that he shot back with the shotgun.
"Orrell Ryan testified that he had been on the police force for seven or eight months and had just finished his course at the Baton Rouge Police Training Academy; that they proceeded in a southerly direction and passed Dayton Street but heard shots as they neared Gordon Street, a block south, and a black female stopped them by waving to tell them of the shooting; that Gernant made a U-turn, proceeded back to the north on Scenic and took a right on Dayton, parked on the south side of the street, almost directly across from the south door; that there were pedestrians in the vicinity but he did not remember if there were any other vehicles; that Gernant grabbed a shotgun and trotted for the door; that he got out, saw three pedestrians walking east on Dayton and told them to come over and asked them if they had heard any shooting and was told they had not; that by that time Gernant was at the door; that he hurried across the street to assist; that Gernant told him to get out of the doorway, which he did; that Gernant then reached across and pulled the door open while saying, `Police come out with your hands up;' that Gernant edged himself into the open space of the doorway and was fired upon; that Gernant fired his shotgun and the recoil knocked him off balance; that he looked in, saw a figure crouching at the northwest corner of the bar and stepped in the doorway and emptied his police revolver into the semi-darkness; that he dropped back to reload, at which time a black male came out of the bar; that he went into the bar and found plaintiff lying on the floor, having been shot in the back. Both Gernant and Ryan testified that a voice from within the bar told them to, `Come on in, I'm out of shells,' before any shots were fired.
"Joe Louis Williams testified that after plaintiff had called the law, Mario London walked in the Dayton Street entrance and that plaintiff and Mario each got a beer *1340 after he told them to get their own beer; that Roy Aron, a/k/a `Caboose,' walked in with another person to see what the commotion had been about but then left by way of the rear door of the lounge; that shortly thereafter the Dayton Street door opened and he saw a shotgun barrel and a pistol, heard nothing neither a voice nor a knock whereupon he fired two or three shots because he thought Walkie Talkie had returned; that plaintiff was between him and the Dayton Street door, to his right, at the time the door opened; that he had been convicted or found guilty of many crimes, including drug charges and attempted murder; that he had bullets left when he was arrested; that he was not charged with any crime resulting from this incident and received his pistol back from the police after several days had expired.
"Mario London testified that plaintiff was his first cousin; that he had parked his vehicle on Dayton Street between the Dayton Street door and Scenic as plaintiff got out of the car to get the beer; that when plaintiff did not come out, he went in to see what was keeping him; that he looked in, saw no one, heard no music and told plaintiff, `Let's go,' but plaintiff responded that the police were coming and wanted to wait; that the Dayton Street door flew open; that he heard nothing, and then shooting started; that he ran out of the bar through the Scenic Highway door and headed in a northerly direction because he was being shot at; that he heard a pistol shot first and then the loud boom of a shotgun.
"Roy Lee Aron testified that he was at the Red Top Lounge at Weller and Powhattan two blocks away when two barmaids from the Rendezvous came in and told of a shooting and called the police; that he was curious so he left the Red Top and went down to the Rendezvous and saw plaintiff and Mario at the bar and Joe Louis behind the bar with a gun in his hand, that Alvin Albert and Charles Williams were with him but they did not stay long and left the back way, walking east on Dayton Street, when a policeman came up and told them to stop.
"Plaintiff testified he had been in the Rendezvous on one past occasion; that he got out as Mario parked and entered through the Dayton Street door; that he saw no one at the bar and asked if anyone was there, whereupon Joe Louis appeared with a gun in his hand and told him he had been shot at and asked him to call the police; that he did so from the pay telephone which was nearby; that about that time Mario came in and he asked Mario to sit down; that Caboose and several others came in, talked for a few minutes and left by the rear door; that he and Mario sat down at the bar and were talking when the shooting started; that Joe Louis stayed behind the end of the bar and he was to Joe's right; that he heard no sound from the outside and whoever opened the door did not identify himself; that Mario started running toward the Scenic Highway door; that he also started running and got about three or four steps before he fell; that he heard a lot of shooting but did not know who shot first.
"Joyce Richardson returned from the Red Top and was across the street from the Rendezvous by a police car which was parked on Dayton Street. She said she heard the police say words to the effect, `Throw your weapons out;' that a policeman was pulling on the door; that when the door opened a shot was fired which hit the burglar alarm, then more shooting started.
"Viola Davis indicated that she was across the street by the tree when the police arrived; that one officer opened the Dayton Street door and then shots rang out.
"Additional testimony, which the court feels is also very significant, indicated that during the investigation made immediately after the shooting, Ryan indicated that he fired six shots at a fleeing subject. Sergeants A. Andrepont and R. Martin, detectives for the Baton Rouge Police Department, investigated the shooting but were not called by the defense as witnesses. They were listed as `may call' defense witnesses on the pretrial order. Weaver indicated *1341 that while Gernant was in the act of opening the door he heard words like, `Police come on out,' and just as the door opened, the shot came out. Weaver indicated there was not enough time for him to give any instructions, but acknowledged that Gernant looked back to see where he was. Weaver also acknowledged that his purpose in going to the scene was to supervise but that he arrived too late. He further acknowledged that Ryan was new on the force and Gernant was a relatively new officer."
A considerable amount of conflicting testimony was given in this case. The Trial Judge in making his findings of fact considered this conflicting testimony, made reasonable evaluations as to the credibility of witnesses and drew reasonable inferences of fact. Because the evidence adduced furnishes a reasonable factual basis for the Trial Judge's findings, this Court will not disturb those findings.
Based on his findings of fact the Trial Judge concluded that the negligence of William Weaver and Joe Louis Williams was the proximate cause of the plaintiff's injuries.
Weaver, as the senior police officer present and the person in charge, was under a duty to properly and adequately supervise his subordinates, Orrell Ryan and Frederick Gernant, two relatively inexperienced officers. At the time of the shooting Weaver was a police lieutenant with twenty years of experience who knew that Gernant was a patrolman with two years experience, most of which was in the traffic division, and that Ryan was a patrolman with less than six months active duty. Weaver's failure to provide proper supervision in a situation involving firearms created a grave risk of serious bodily injury to innocent parties at the scene. The Trial Judge found as a fact that, although Weaver had ample opportunity to issue instructions and provide supervision, he failed to do so. Weaver informed Gernant and Ryan by radio that he would provide their backup. He also arrived at the Rendezvous Lounge at the same time as Gernant and Ryan and was close enough to them to hear what was said by them. In addition, Weaver had a PA system on his patrol car over which he could have given orders. As the Trial Judge recognized, all Weaver had to do was cross the street and take command and the situation would have been avoided.
In failing to provide supervision Weaver breached a duty he owed the plaintiff and the other parties present. This breach of duty by Weaver allowed a situation to develop which resulted in the plaintiff being shot in the back by Weaver's subordinate. Weaver's failure to act was a legal cause of the plaintiff's injury, and he is therefore, under Civil Code Article 2315, obliged to repair it.
The Trial Judge concluded that Gernant and Ryan were not at fault in the shooting because they were responding to an emergency situation which they did not create and could not control. The doctrine of sudden emergency holds that:
"One who suddenly finds himself in a position of imminent peril, without sufficient time to consider and weigh all the circumstances or best means that may be adopted to avoid an impending danger, is not guilty of negligence if he fails to adopt what subsequently and upon reflection may appear to have been a better method, unless the emergency in which he finds himself is brought about by his own negligence."

Hickman v. Southern Pacific Transport Company, 262 La. 102, 262 So.2d 385, 389 (1972).
The Trial Judge erred in his application of this doctrine. In the present case the sudden emergency in which Gernant and Ryan found themselves was brought about by their own negligence. The police cars arrived at the scene with their sirens and bubble lights off. Gernant grabbed a shotgun, got out of the police car and headed *1342 straight for the Dayton Street entrance of the Rendezvous Lounge. Ryan got out of the police car, stopped a pedestrian but did not question him, and then followed Gernant to the door. Gernant and Ryan took positions to either side of the door. Gernant opened the door, which swung toward him, and yelled, "Police come on out." His shout was not heard inside the lounge. Gernant peered around the door with the shotgun in his hands. A shot was fired from inside the lounge and the police officers returned the fire, Gernant at a muzzle flash and Ryan at a fleeing figure. The plaintiff was struck in the back by a bullet from Ryan's pistol.
The sudden emergency occurred when Joe Louis Williams, who feared the return of Walkie-Talkie fired a bullet through the open door. Joe Louis Williams fired because he saw the door swing silently open and a shotgun and pistol come in. If Joe Louis Williams had known it was the police he had summoned at the door, and not Walkie-Talkie, he would not have fired. Therefore, the sudden emergency was brought about by the actions of Gernant and Ryan.
Gernant and Ryan were under a duty to take proper precautions in approaching the scene of a reported shooting. Their failure to investigate the situation before proceeding to the door and their failure to adequately announce their presence breached this duty and created a grave risk of serious bodily injury to persons at the scene. Gernant and Ryan could have made their presence known by arriving with their siren on and bubble light flashing, by using the PA system on their car, or by making sure that they were heard when they yelled at the door. They could have investigated the situation by questioning the pedestrian they stopped or by using the Scenic Highway entrance, which entrance would have allowed them to see inside the lounge. Their failure to take any of the above steps was negligence and the legal cause of the sudden emergency and the injury to the plaintiff. Therefore, they are liable under Civil Code Article 2315.
The Trial Judge concluded that the Mayor and Chief of Police of the City of Baton Rouge were not liable because the plaintiff failed to prove negligence on their part. In general, public officers such as mayors and police chiefs are not liable under the doctrine of respondeat superior for the actions of their subordinates. Taylor v. City of Alexandria, La.App., 261 So.2d 92 (3rd Cir. 1972). The negligence alleged as a basis for personal liability on the part of Mayor Dumas and Chief Radcliffe was their failure to provide adequate training and instruction for officers Gernant and Ryan. Gernant's and Ryan's training consisted of classes at the police academy and on the job training under the supervision of a more experienced officer. As the Trial Judge concluded, there is nothing in the record to show that these officers were inadequately or improperly trained. Therefore, there is no liability on the part of the Mayor and the Police Chief.
The defendants argue that, even if their negligence was the cause of the plaintiff's injury, the plaintiff, by staying in the Rendezvous Lounge, assumed the risk of being shot and cannot, therefore, recover for his injury.
In order to assume a risk one must knowingly and voluntarily encounter a risk which caused him harm. It is necessary that the party understand and appreciate the risk involved and accept the risk as well as the inherent possibility of danger because of the risk. McInnis v. Fireman's Fund Insurance Company, La., 322 So.2d 155 (1975). There is nothing of record to indicate that the plaintiff was aware of, or appreciated the risk of being shot by the police. The plaintiff's actions were those of a good citizen, he called the police to report a shooting and then waited for them to arrive. He did not, by calling the police, assume the risk of being shot by them.
The Trial Judge in discussing the amount awarded the plaintiff stated:

*1343 "As a result of this gunshot wound, plaintiff has been permanently rendered a paraplegic. He has sustained awesome and grievous injuries which are irreversible. He is completely paralyzed from the chest down. He will never walk again. He will continue to encounter urinary tract problems caused by infection resulting from an indwelling catheter, along with major skin complications and rashes resulting from wearing the appliance which collects his urine. He has a neurogenic bladder. The catheter causes skin problems because the skin around it cannot breathe properly. Dr. William Wall, a urologist, was of the opinion that plaintiff must have constant medical supervision and control to monitor these infections which are directly associated with his paralysis and that he should have x-rays and kidney studies at least once a year and seen by a urologist twice a year. Dr. Wall also indicated that the infection had destroyed his left testicle which produces sperm and male hormones.
"Dr. L. P. Laville has treated plaintiff for the general breakdown of his skin since September 5, 1975. Plaintiff suffers from open skin ulcers. His paralysis aggravates these ulcers because he cannot feel them. Dr. Laville felt that plaintiff would need professional help to treat these skin problems for the rest of his life.
"Inasmuch as plaintiff has absolutely no control over his urinary and bowel functions, he must be turned in bed at least once every night and his bed sheets are changed every night. This will continue for the rest of his life. He has lost all sexual functions.
"Dr. Robert H. Myer, a physician from the Texas Institute of Research and Rehabilitation who specializes in physical medicine and rehabilitation, has treated plaintiff for some time. Dr. Myer indicated plaintiff has the following side effects from his paraplegic condition: (1) urinary tract infections; (2) skin breakdown; (3) thrombophlebitis; (4) bowel infunction; (5) spinal cord phantom pain, which limits sitting time; (6) epiderminitis; (7) some respiratory muscles paralyzed; and (8) loss of sexual function. Dr. Myer also indicated that plaintiff perspires profusely above the T-4 level because he cannot sweat below that level. He is on six different medications which he must take daily for the rest of his life.
"Dr. Myer characterized plaintiff as very pleasant, cooperative and anxious for rehabilitation but every time they get ready to prepare him for vocational training and make significant progress along these lines, there is some medical setback which delays rehabilitation. Dr. Myer felt that plaintiff must make a minimum of one visit per year to the clinic for a week as an inpatient, which will cost about $1,000.00 a visit.
"Plaintiff's past medical expenses have been frightening and total $33,025.10. Future medical expenses can very reasonably be estimated at $5,000.00 per year based upon prior experience. The court feels that an award of $150,000.00 for past and future medical expenses is reasonable.
"The plaintiff was gainfully employed by Crown-Zellerbach as a brake handler and had been employed as such since 1969. At the time of the accident, he was making $3.84 per hour. If he had been employed on the date of trial, his wage would have been $4.78 per hour.
"The testimony indicated that as of the date of the trial, plaintiff had past lost wages totaling $25,026.00. Ray Biscoglia, an actuary, felt that plaintiff had a working life expectancy of 33.2 years and felt that at an hourly rate of $4.78, the present value of future wages was $224,960.00 after discount. The court is not bound by such computations but feels that plaintiff was a productive citizen with a good job prior to his disability and that an award of $125,000.00 for past and future wages will do substantial justice.

*1344 "Additionally, plaintiff is entitled to recover general damages for his pain and suffering, mental anguish, disability and all the other losses which he has sustained, which are incalculable. The court feels that $150,000.00 will do substantial justice for these injuries."
(Written Reasons for Judgment, pgs. 11-13).
"Before a Court of Appeal can disturb an award made by a trial court the record must clearly reveal that the trier of fact abused its discretion in making its award." Coco v. Winston Industries, Inc., La., 341 So.2d 332 (1976). The record contains evidence as to the plaintiff's past medical expenses, expected future medical expenses and possible future medical expenses. There is also evidence as to the plaintiff's past rate of pay and the present rate of pay for the job he held before his injury. The record details the plaintiff's past, present and expected future mental and physical condition. The Trial Judge considered all of these factors and the testimony of an expert actuary in determining the amount of the award granted plaintiff. As to quantum we find no abuse of discretion by the Trial Judge.
In discussing the award made to the intervenor the Trial Judge stated:
"Candace B. London, plaintiff's former wife, has intervened herein, claiming a one-half interest to any damage award accruing to the community of acquets and gains formerly existing between them. At the time of this shooting, plaintiff was living separate and apart from his wife. On August 28, 1973, he filed suit against her for a divorce based on living separate and apart for more than two years. No adjudication of fault was made and on October 5, 1973, a judgment of final divorce was awarded to plaintiff. Plaintiff's loss of wages from the date of the accident until August 28, 1973, was determined to be $6,373.00. Special medical expenses accruing prior to the dissolution of the community on August 28, 1973, are itemized as follows:

(1) Our Lady of the Lake
Hospital and physician services
rendered therein $ 1,750.00
(2) Texas Institute for Rehabilitation
and Research 13,717.70
(3) Dr. Pelosof, Dr. Spira,
Dr. Cardus, Dr. David, Dr.
Guilfith, and Dr. Harrington 831.00
(4) Sitter in hospital 150.00
(5) Medical supplies and appliances,
1973 1,064.49
(6) Drugs, 1973 ($640.00 and
$173.20) 813.20
 __________
 $18,326.39
 ==========

"No evidence was presented as to a community property settlement, satisfaction of this community indebtedness or the like. Without some showing that these medical expenses still exist as a claim against the community, the court feels intervenor is entitled to recover one-half of said medical damages. The court will entertain plaintiff's motion to reconsider this award in the event that these expenses have not been previously satisfied out of community assets.
"Intervenor's claim for one-half interest of any general damages which had accrued prior to the date of the dissolution is governed by the recent pronouncement in West v. Ortego, 325 So.2d 242, where the Supreme Court held:
`. . . where a husband's settlement monies, acquired after dissolution of the community, but based upon a pre-dissolution, accident-related cause of action, compensate for both pre-dissolution and post-dissolution losses, that portion of the settlement which compensates for post-dissolution falls into the separate estate of the husband.'
"The court has awarded plaintiff the sum of $150,000.00 in general damages. His claim from December 8, 1972, through August 28, 1973, would belong to the community which existed between him and the intervenor. The court feels that a substantial portion of the loss which plaintiff sustained accrued during this period *1345 of time and fixes one-third of the above award as the damages occurring during that period. Accordingly, intervenor would be entitled to one-half of $50,000.00
"Intervenor is entitled to judgment for $3,186.50, for $9,163.19, and for $25,000.00, or a total of $37,349.69."
The intervenor contends that the Trial Judge erred in apportioning the award for general damages. In making this apportionment it is clear that the Trial Court considered the evidence that a large portion of the loss sustained by the plaintiff occurred within the first few months following his injury. It is also apparent that the Trial Judge considered the fact that the plaintiff has many years of pain and inconvenience ahead of him. The Trial Judge has much discretion in assessing damages. We find no abuse of this discretion in the Trial Court's apportionment of the award for general damages.
The defendants contend that the Trial Judge erred in failing to take into account their ability to pay. Considering that one of the solidary obligors in this case is the City of Baton Rouge, we cannot say that the Trial Judge failed to take into consideration the defendants' ability to pay when he fixed the award. There is no evidence in the record which would indicate that the City of Baton Rouge is unable to meet the judgment rendered against it.
Defendants have argued forcefully and well that they should be exonerated. The decision has been a difficult one for the courts since we are cognizant of the problems and sympathetic toward the sometimes almost impossible situation police officers find themselves in. However, modern society cannot continue to exist without imposing standards on and requiring responsibility of its police officers. This decision is not to be interpreted as an unrestricted imposition of liability on all police officers under all circumstances. Instead it is a finding that the officers in this case did not measure up to the standards of care that society expects and has to expect from its officers in its difficult task of protecting the public under all circumstances.
For the above reasons, the judgment appealed is reversed insofar as it dismisses the actions of the plaintiff and the intervenor against Orrell H. Ryan, Jr. and Frederick Gernant and affirmed as to all other matters. The judgment of the District Court is hereby amended to render judgment in favor of Henry London, Jr. and against William L. Weaver, Orrell H. Ryan, Jr., Frederick Gernant and the City of Baton Rouge, jointly, severally and in solido for the sum of $387,650.31, together with legal interest from date of judicial demand and for all costs of these proceedings; and to render judgment in favor of Candace B. London and against William L. Weaver, Orrell H. Ryan, Jr., Frederick Gernant and the City of Baton Rouge, jointly, severally and in solido for the sum of $37,349.69, together with legal interest from the date of judicial demand.
AFFIRMED IN PART, REVERSED IN PART, AMENDED, AND RENDERED.