McBRIDE, Judge.
On Sunday November 16, 1952, at about 3:45 in tKe afternoon, two automobiles collided in the south half of the traffic circle at the foot of the Huey P. Long Bridge in Jefferson Parish. One of the cars, a Nash sedan, owned and driven by Hillard M. Covey, had just crossed the bridge from New Orleans and- it was necessary that Covey, who decided to return to New Orleans, proceed counterclockwise around the circle in order to reach the lane of the bridge accommodating a return trip. The other automobile involved in the accident was the 1940 Dodge sedan of Alfred J. Landry, which he was driving in an easterly direction, i. e., toward New Orleans. -Landry had been driving on U. S. Highway 90 (Old Spanish Trail) and this highway, merging as it does with the west side of the bridge circle, required that Landry traverse the south half of the circle to reach the bridge. In other words, when Landry’s car got within the circle it had to take the same course as the Covey car.
There is no serious dispute that the right of the rear end of Covey’s automobile was run into and damaged by the left front of the Landry vehicle. After the impact Landry’s Dodge veered to the right and crashed into a guard rail.
The two cars came into collision about 50 feet beyond the stop sign which confronted Covey as he rounded the west half of the circle. The mentioned traffic sign serves the purpose of -warning motorists proceeding as was Covey of the danger posed by -traffic entering the circle from Highway 90. The most worthy estimate of the 50-foot distance came from Spicuzza, trooper of the State Police, who investigated the accident at the scene just a few minutes after it happened. Spicuzza was able to make his estimation after viewing the broken glass and debris in the roadway which indicated the place of impact and by calculating its distance from the sign.
The accident gave rise to two suits which were consolidated to facilitate a trial. Mr. and Mrs. Rezhalla Jacobs, who were guest passengers in the Covey car, sued Landry, Covey, Marquette Casualty Company, which is the public liability insurer of Landry’s car, and the Fidelity Mutual Insurance Company, which is the public liability insurer of the Covey automobile, all jointly and in solido. Jacobs seeks to recover $1,906.50 for personal injuries and medical expenses incurred in connection with the injuries to himself and his wife; Mrs. Jacobs prays for $38,500 as the amount of her physical injuries.
In the other suit, which is entitled Covey v. Marquette Casualty Company, La.App., - So.2d -, the plaintiffs therein seek to recover their damages from Landry and his insurer.
In the suit which we are now considering, Mr. Rezhalla Jacobs and Mrs. Mary Jacobs, wife of Rezhalla Jacobs v. Alfred J. Landry et al., there was judgment in favor of Jacobs for $406.50 and in favor of Mrs. Jacobs for $1,000 against Hillard M. Covey and his insurer, the Fidelity Mutual Insurance Company, in solido. The suit as against Landry and Marquette Casualty Company was dismissed. Appeals have been taken by Covey and Fidelity Mutual Insurance Company and also by Mr. and Mrs. Jacobs.
The voluminous record is embellished with contradictions, inconsistencies, and some apparent falsified statements. For instance, Landry emphatically denied sixteen or more times that his automobile hit the Covey car, notwithstanding that all other eyewitnesses are in full agreement that it did.
The pleadings set forth numerous charges and countercharges of negligence against the respective drivers, but we need concern ourselves with but three and those *483 are that Covey failed to bring his car to a stop at the sign and that Landry was driving at a fast and illegal rate of speed and failed to keep a lookout for traffic in the circle. The defendants in the suit brought by Covey make the alternative allegation that Covey’s negligence contributed to the accident.
The trial judge concluded that the sole and proximate cause of the accident was Covey’s failure to stop in obedience to the official sign located at a point where Highway 90 merges with the bridge circle.
Covey vehemently contends that he- did bring his car to a stop before proceeding into the south rim of the circle and his testimony is corroborated by his wife, Mr. and Mrs. Jacobs, and also by Powell, who is an entirely disinterested witness. We are impressed by the testimony of Mr. and Mrs. Jacobs who were guest passengers of Covey and who have impleaded Covey and his insurer as defendants in this suit. It appears certain they would not have testified that Covey made the stop if such were not a fact for it would have been of distinct advantage to them if the evidence had shown that Covey disregarded the stop sign. Their testimony coming as it did takes on special significance as being an admission against their interest and as such is entitled to much weight.
Danny Powell not only said that he observed Covey’s car .come to a stop but that he saw it start off and travel for a short distance whereupon it was run into by Landry’s car which came out of Highway 90 at approximately SO miles per hour. Powell was standing about ISO feet removed from the point of the impact.
Landry and his three eyewitnesses insist that Covey did not stop, but their testimony is not convincing. We simply do not believe Landry ever saw the Covey car until just before running into it. Landry’s other witnesses were not sufficiently near the circle to know whether or not Covey stopped at the sign. Perkel is Landry’s nephew and his account is that his was the second car behind Landry’s and that from a distance of 600 feet he could see Covey go past the sign without stopping. Williams and Toka, who were in the automobile following Landry’s car, said they observed from about a block away that .Covey did not make the stop. It might be mentioned that Williams and Perkel are guilty of making statements not in keeping with the facts. Williams claimed ,the accident happened only 9 or 10 feet- beyond the stop sign and further, he also believed that the driver of the Covey car was a woman. Perkel made the ridiculous .assertion that it was somewhere around 350 to 400 feet from the stop sign to the point at which the Covey car was hit.
We repeat that our belief is that Landry never sighted Covey until just before the impact when he made the ineffectual swerving maneuver to the right in an attempt to avoid an accident. Landry would have us believe that he sighted Covey’s car when he was 40 or 50 feet from the circle, but the State Trooper emphatically testified that when Landry was interrogated at the scene of the accident he admitted that he did not know of the presence of the Covey car “until he got right up on” it.
The speed at which Landry was traveling must come in for some discussion. Neither Covey nor his passengers know anything regarding this feature because Landry came from, their rear. Powell fixed Landry’s speed at approximately 50 miles per hour. Landry stated that he had been going “30, 35, 40” miles per hour on the highway but slowed down to 30 miles per hour at the circle and had further slackened his speed to 15 miles an hour when the crash came. Spicuzza, the State Trooper, testified Landry made the statement that his speed was 45 miles per hour, and this inclined the trooper at the moment to lodge a charge of speeding against Landry. However, the charge was never made. Williams, we believe, threw some light on Landry’s speed for' hé states that he was driving his own car at 40 miles per hour and that Landry overtook and passed him. Our appreciation of Williams’ testimony, which is for the most part vague, is that when Landry’s car was at the circle it was about a block ahead of his car, which circumstance dem *484 onstrates that Landry was driving at more than 40 miles per hour.
Covey stated that from the stopped position at the sign he saw two cars approaching on Highway 90 which were about 600 feet away, and feeling that it was safe tó prócéed, he started forward and had traveled SO or 60 feet when his car was hit. He says that his speed was not more than 10 miles per hour. That Covey’s car was moving at a slow rate of speed seems to he the only detail on which all of the witnesses are entirely in accord.' Landry stated that he was led to believe that' because of his slow speed Covey would stop at the sign.
One of the cars which Covey said he noticed on the highway 600 feet away was unquestionably the .automobile of Perkel, for we can deduce from Perkel’s testimony that when he was 60(3 feet away from the circle he saw Covey’s car at the sign. Landry and his witnesses say there were three cars on" the highway moving toward the circle and not two as Covey mentioned. This may be true, and if there were three cars, they were at staggered distances which caused Covey to labor under the impression there were but. two cars coming in his direction which is quite, understandable.
We think that when Covey stopped at .the sign Landry’s car was then a considerable distance down the highway though perhaps not the full distance of 600 feet as estimated by Covey, but certainly more than the 40 or 50 feet as mentioned by Landry, and that Landry without looking out for other traffic drove into the circle at an excessive rate of speed and crashed into the rear end of Covey’s car, which had traveled at a very slow rate of speed a distance of 50 feet from..a,stopped position. Qne fact that appears to be significant and bolsters our view that Landry did not see Covey’s car is that Landry followed Covey’s car in the inner lane of the circle for 50 feet or more. If Landry had seen Covey’s automobile from a distance -of 40 to 50 feet before reaching the circle, which is his account, we fail to understand why, if he.could not stop his vehicle, he did not make a timely swerve to the. right so-as to pass Covey on the outer lane of the circle. Thus, eyen taking Landry’s" testimony at full value, it shows he had, but failed to exercise it, the last clear chance of avoiding the accident.
Our conclusion is that the sole cause of the accident was the negligence of .Landry and he and his insurer are liable unto plaintiffs. We fail to find any negligence, primary or otherwise, on Covey’s part.
A court of appellate jurisdiction is disinclined to reverse the findings of the trial judge in cases where only a question of fact is involved, but we are convinced, after a careful analysis of the bulky record in the case, that there is manifest error in the judgment. The matter was tried in the lower court piecemeal on December 21 and 22 and again on April 12,1954," and the judgment was not rendered until May 11, 1954. Possibly the lapse of time, between the December hearings and the one held on April 12, 1954, might have caused some confusion in the mind of the trial judge as to the details of the evidence which had been taken at the earlier hearings.
In the case of Anderson v. Morgan City Canning Co., Inc., La.App., 73 So.2d 196, 201, we quoted from the case of Owens v. Felder, La.App., 35 So.2d 671, as follows:
“ We are reluctant to reverse the " finding of a trial court" based primarily on questions of fact, but in a case, such as we are presently analyzing, it is a self evident principle that it is occasionally easier to perceive fallacies and inconsistencies contained in the record by a comparison of the various portions of the transcribed record with other pertinent portions than it is to accu- ■ rately 'obs’erve and catalogue ■ them -while listening to the oral evidence of the various witnesses who testified during the course of the trial.’ ”
There is- unquestionably considerable feeling of enmity between Mrs. Covey and Mrs. Lozier. The ladies are cousins. Notwithstanding that and the fact that Mrs. Lozier was a guest in the Covey car on that *485 Sunday afternoon, she .appeared as a witness against Mr. and Mrs. Govey, and testified that the impact between the cars was very slight and i
“How Mrs. Covey or the Jacobs could possibly be hurt is a mystery to me, since the j.olt of the accident was not severe at all, and none of them were thrown from their seats.”
Nevertheless, we are of the opinion that the crash was heavy, otherwise the Covey car would not have been damaged to the extent that it was.
Both Mr. and Mrs. Jacobs were injured and it has been adequately proven that their doctor’s bills, hospital bills, and . X-ray charges aggregated $281.50 which Rezhalla Jacobs is undoubtedly entitled to recover.
Jacobs’ injuries consisted of' contusions of a mild nature of the lower left chest an-teriorly. He placed himself in th'e care of Dr. William Fisher, a general surgeon, who testified that he saw and treated Jacobs fourteen times; that for a month Jacobs complained of pains in the chest. There' are no permanent injuries.
The award in favor of Jacobs was for $406.50, and although the reasons for judgment do not so state, we believe the trial judge allowed $281.50 for medical expenses plus $125 for physical injuries. The sum of $125 for physical injuries appears to be inadequate. and we will increase the amount to $300.
Mrs. Jacobs is a stout woman 50 years of age. Her injuries, while more serious, were not permanent. She, like her husband, was treated by Dr. Fisher, who first saw her on November 18, 1952, which was the second day after the accident. An examination at the time revealed tenderness in her chest, lower back, and lower lumbar region. .Dr. Fisher’s opinion was that Mrs. Jacobs had a sprain -in the lower lumbar -region; he recommended heat therapy and rest on a hard bed. In all he treated the patient on twelve or.thirteen occasions,.the-last time on September 17, 1953. Mrs. Jacobs on her last visit still complained of symptoms re- - ferable to- the lower back, but Dr. Fisher says he could, discern no. obj ective symptoms.
Dr. Fisher suspected there was a narrowing of the fifth lumbar interspace and thpught the injuries might possibly, have aggravated an existing arthritic condition. As no adequate test was made for verification of the suspicion that Mrs. Jacobs sustained a protrusion of the disc, we will not speculate thereon nor will we speculate that a pre-existing arthritic condition was aggravated.
Mrs. Jacobs testified that a week or so after the accident she experienced a nervous- breakdown which confined her for a '■week at Touro Infirmary under the care of •a Dr. Houston, who incidentally did not appear as a witness. Mrs. Jacobs' admitted that some nine years ago she had such a breakdown, and in the absence of medical testimony showing causal connection between the recent breakdown and the accident, we cannot say that the complaint resulted from the accident.
It appears that in April 1953 Mrs. Jacobs was advised by Dr. Fisher to call on Dr. Robert M. Rose, an orthopedist, who made his examinations on April 8, 15 arid May 1, 1953. On the basis of clinical findings, as well as on X-rays, Dr. Rose concluded the patient had an arthritic reaction of her spine about the lumbosacral region. He believed that condition had existed for a much longer period of time than had elapsed since the accident. Dr. Rose found no significant .residuals which could be directly attributable to the accident.
Dr. George Berkett, on behalf of Landry’s insurer, also saw Mrs. Jacobs .and.examined her on December 18, 1953, and his opinion was that she had completely recovered from any effects of the accident.
An. attempt was made by counsel for Landry and Marquette Casualty Company to discredit Dr. Fisher by showing that a complaint for violatiori of U.S.C.A. Title 18, § 494, was; filed against him by the United ■States for unlawfully forging a prescription for 33 cc’s of demerol, which was allegedly *486 used by him personally. He also elicited on cross-examination Dr. Fisher’s admission that he had voluntarily taken treatments for drug addiction.
 The certified copy of the complaint above referred to, standing alone, is inadmissible as evidence, and although it was received without objection, certainly it does not make prima facie proof of its recitals. In criminal cases evidence of conviction of a crime but not of arrest, indictment, or prosecution is admissible for the purpose of impeaching the credibility of the witness. LSA-R.S. 15:495. There is no statutory provision concerning the admission of such evidence in civil cases, but we do not think that evidence of such type is any more admissible in a civil action than it is in a criminal matter.
The argument is made that Dr. Fisher’s voluntary submission to treatment for drug addiction attests that he was incompetent as a medical practitioner and was guilty of grossly overtreating the plaintiffs.
No one could successfully deny that the excessive use of narcotics, just as the excessive use of intoxicants, carries the effect of dulling the faculties of the user and in some cases to such an extent as to affect his capacity to carry on his business or profession, but there is no showing to what extent Dr. Fisher was addicted to the use of narcotics, and we cannot tell whether their use impaired his competency as a practicing physician or affected him morally, mentally, or physically so as to reflect on his credibility as a witness. It cannot be presumed that Dr. Fisher was unfit to treat his patients or that he swore falsely when he gave his testimony in the case. Nothing in his deposition leads to the conclusion that either is the case. We feel sure that if Dr. Fisher had been a user of narcotics to such excess that his ability to practice medicine had become impaired that the Louisiana Board of Medical Examiners would have done something about it.
Dr. Fisher in giving his deposition referred to certain of his office memoranda which he refused to produce in court in response to a writ of subpoena duces tecum. His refusal to'exhibit the records was based on the contention that his office records were privileged communications as between himself and his patients, and his position was upheld by the trial judge who ruled that the witness could not be compelled to exhibit the office records. There is no necessity for passing on the correctness of the ruling because the record as a whole discloses to our satisfaction the nature and duration of the injuries sustained by Mr. and Mrs. Jacobs. Almost all of Dr. Fisher’s testimony was from his independent recollection. Dr. Rose, the orthopedist consulted by Mrs. Jacobs, thought that the condition in her spine was the result of a pre-existing arthritic condition. But Dr. Rose, who did not see Mrs. Jacobs until several months after the accident, could not know what her condition might have been previously. We believe that Mrs. Jacobs did sustain the sprain in her lower back. Undoubtedly this condition had disappeared by the time Dr. Rose saw her. This would coincide with Dr. Fisher’s statement that after April 2, 1953, no objective signs of injury were present.
The trial judge rendered judgment for $1,000, and our opinion is that the award does substantial justice and amply compensates Mrs. Jacobs for her injuries which required extended treatment and caused pain for several months. Mrs. Jacobs was inconvenienced to the extent of sleeping on a hard bed.
For the reasons assigned, the judgment appealed from is reversed, annulled and avoided, and it is now ordered that there be judgment in favor of Rezhalla Jacobs for $581.50 and in favor of Mrs. Rezhalla Jacobs for $1,000 and against Alfred J. Landry and Marquette Casualty Company, jointly and in solido, with interest at the legal rate from judicial demand until paid; it is further ordered, adjudged and decreed that said plaintiffs’ suit as against Hillard M. Covey and the Fidelity' Mutual Insurance Company be and the same is hereby dismissed. Alfred J. Landry and Marquette Casualty Company are cast for *487 plaintiffs’ costs in both courts; plaintiffs are to pay the costs of Hillard M. Covey and the Fidelity Mutual Insurance Company in both courts.
Reversed.