363 So.2d 235 (1978)
Mrs. Dorothy Yarls Gordon, wife of/and James T. GORDON, Sr.
v.
CITY OF NEW ORLEANS, New Orleans Police Department, Donald Lagarde and Marcel David.
No. 9253.
Court of Appeal of Louisiana, Fourth Circuit.
September 12, 1978.
Rehearing Denied October 25, 1978.
*236 Gertler & Gertler, M. H. Gertler, New Orleans, for plaintiffs-appellants.
Wayne G. Cresap, Asst. City Atty., and Philip S. Brooks, City Atty., New Orleans, for defendants-appellees.
Before SAMUEL, REDMANN and STOULIG, JJ.
SAMUEL, Judge.
This is an action for wrongful death. Plaintiffs allege their son, a senior high school student, was negligently shot and killed by Donald Lagarde and Marcel David, officers of the New Orleans Police Department. Named as defendants are the City of New Orleans, the New Orleans Police Department, Lagarde and David. The defendants' answer denies liability and pleads self-defense on behalf of Lagarde and David. Charity Hospital of Louisiana at New Orleans intervened for medical services rendered to the decedent.
After a trial on the merits (the trial was held before the judge alone and not to a jury), there was judgment in favor of all defendants, dismissing plaintiffs' suit at their cost. Plaintiffs have appealed.
The undisputed facts are:
Shortly before 9 p. m. on February 15, 1975, three New Orleans police officers, Lagarde, David and Gordon Hagen, all dressed in plain clothes, were cruising in an unmarked police automobile on Dale Street in New Orleans. They were attempting to locate two persons, a man suspected of perpetrating an armed robbery and an informant who knew the suspect's whereabouts. While traveling at a speed of about 15-20 m. p. h. in a lakebound direction, they observed a group of about 10 to 12 males congregated on the sidewalk. Unknown to the officers, the group was engaged in a dice game. The police vehicle stopped in the middle of the street adjacent to the group of men. The vehicle was recognized by members of the group as a police car. One Ernest Brock, nicknamed "Yogi" by his friends, and decedent were members of the group. After the officers exited from the police car, gunfire broke out. (Who initiated the gunfire and who actually fired guns are issues of fact disputed by the parties.)
Prior to or during the gunfire almost all of the members of the dice-playing group dispersed. The decedent, however, remained on or near the sidewalk. During the gunfire, in which decedent did not participate, he was hit by a .38 caliber bullet fired by Lagarde.[1] David and Lagarde each fired two shots. Hagen did not fire any shots but witnessed most of the events leading to decedent's death. Decedent was transported to Charity Hospital by an emergency unit called to the scene by Lagarde. Later that night (at 11:30 p. m.), he died at the hospital from the bullet wound. Sometime after the gunfire ceased, Ernest Brock walked over to Lagarde and David unarmed. He was arrested and charged with the attempted murder of Lagarde, David and Hagen. Brock was not prosecuted for this charge.[2]
*237 The stage of the shooting incident was set in the following manner: On the date of the incident, the area of its occurrence was the 4300 block of Dale Street, a two-lane, bidirectional street, intersected by Warfield on the south or uptown end, and by Ransom on the north or lake end. The street was illuminated by street lights. An establishment called the Dreamland Lounge was located across the street from where the group was playing dice. A black Chevrolet was parked in front of the lounge and a brown Oldsmobile was parked at 4325-27 Dale Street, across the street from the lounge and adjacent to the dice game. The police car was parked approximately in the middle of the street between the black Chevrolet and the brown Oldsmobile. Other cars were parked along both sides of Dale Street.
There is contradicting evidence on the pertinent question presented, who initiated the gunfire. The trial judge resolved this question in favor of the defendants. He concluded that when the police vehicle stopped and the officers disembarked therefrom some gunshots were fired at them by "some individual from around the dice game area", that fire was returned by two of the officers, and thus the defendants were not negligent in causing the death of young Gordon.
On appeal defendants primarily rely on our settled jurisprudence that when the evidence is conflicting an appellate court should not disturb the trial court's ". . . reasonable evaluation of one set of witnesses as credible, and its consequent rejection of the testimony of the opposing set of witnesses . . ." Billiot v. Bourg, La., 338 So.2d 1148, 1152; Canter v. Koehring Company, La., 283 So.2d 716; Robertson v. Palmer, La.App., 74 So.2d 408. Ordinarily in the absence of manifest error we cannot disturb the trial judge's findings of fact. Echizenya v. Armenio, La.App., 354 So.2d 682.
However, in response, and this is their primary complaint on appeal, plaintiffs point to the fact that, despite timely objections thereto, the trial judge allowed the attorney for defendants to cross examine plaintiffs' witnesses regarding their prior arrests. Plaintiffs argue this was error and could have improperly affected the weight placed by the trial judge on the credibility of those witnesses.
We agree the ruling complained of was error. Although plaintiffs cite only criminal cases to support their contention, evidence of a witnesses' arrest record also is inadmissible in a civil action. Jacobs v. Landry, La.App., 82 So.2d 481. While we feel that in all probability the trial judge was not improperly influenced by testimony showing prior arrests of some of plaintiffs' witnesses, in an effort to be completely fair to the plaintiffs, we will consider the cross examination of their witnesses regarding prior arrests as consequential or prejudicial error. As a result of this consideration, we cannot give the usual weight to the trial court's findings of fact.
In Louisiana, as provided by both the Constitutions of 1974[3] and 1921,[4] the jurisdiction of appellate courts in civil cases is and has been expressly extended to the review of facts as well as law. These provisions are implemented by Code of Civil Procedure Article 2164, which in pertinent part provides: "The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal."
Under these provisions our settled jurisprudence is that, even where the trial court has committed consequential or prejudicial error in the admission or refusal to admit evidence, or in instructing a jury, when the appellate court has all of the facts before it such error will not warrant remand and the appellate court must make its own independent conclusion as to the facts *238 as revealed in the record before it.[5] Accordingly, as the entire record is now before us, rather than remand this case for a new trial, we proceed to an independent consideration of the facts revealed in the record. In our review we completely disregard any testimony or other evidence concerning prior arrests of any of plaintiffs' witnesses.
An alleged eyewitness of the incident, Shirley Williams, testified to the most complete version of plaintiffs' several versions of what happened. He testified: The group of men were playing dice on the sidewalk across the street from the Dreamland Lounge when an unmarked police car stopped in the middle of the street, adjacent to the dice game. The police officers immediately opened fire on the crowd playing dice. All members of that crowd were unarmed. The police officers were the only ones shooting during the gunfire. Everyone in the crowd of dice players, except decedent, ran to the north or south ends of the street. Four or five quick shots were fired from the direction of the police car. When the shooting ceased, decedent crawled across the street on his stomach and knees and asked the police officers, "Why you all shoot me?" In response to the decedent's question, the officers "collared" decedent "up as high as the car tire" and stated, "you black mother _ _ _ _ _, if you don't tell who had the gun, I'll blow your brains out."
Williams admitted having a "couple of beers" before the incident and recalled the weather was dry. (Regarding the condition of the weather, the testimony of other witnesses, including the decedent's father, is to the contrary.) Williams further stated he was standing in the doorway of the Dreamland Lounge when he viewed the incident, and that he knew the decedent.
Jerry Bell, another plaintiff alleged eyewitness, corroborated Williams' testimony to the effect that the police officers immediately opened fire on the crowd playing dice, and that the police officers were the only persons armed. Bell, who admitted decedent was his lifelong friend, testified that before shooting, the police officers shouted "hold it". Bell further said he saw decedent standing with his hands over his head, and that he heard 3 or 4 quick shots sounding from the police car area.
The following four witnesses also testified for the plaintiffs:
(1) Dewitt Galman, Jr.;
(2) Anthony Bernard;[6]
(3) Ernest Brock; and
(4) Larry Kennedy.[7]
Although none of the above four witnesses testified he actually saw the police officers firing, all of them but Brock testified they heard 3 or 4 quick shots. Brock testified he did not see or hear gunfire even though he also said that during the shooting he was standing a block away from where the shooting occurred. All of the above four witnesses corroborated Bell's and Williams' testimony that all members of the dice game were unarmed. Brock specifically denied he possessed a weapon on the evening in question, and claimed he did not understand why he was arrested. He acknowledged his friends called him "Yogi".
Brock's landlord of five years, a man who allegedly routinely cleaned Brock's room, testified he had never seen a weapon in Brock's possession. However, two lay witnesses for the defense, employees at the Owl Food Market, testified that Brock was *239 known as "Yogi" and that Brock often bragged about getting away with shooting at the police.
Defendants' version of the incident, as testified by Lagarde and David, was that while driving on the 4300 block of Dale Street they saw the group of men and that at least two members of the group were armed with guns. One man appeared to be armed with an automatic. Lagarde told Hagen, who was driving, to stop the car. When the car stopped, Lagarde opened the car door and shouted "police, drop it", while simultaneously exhibiting his I.D. folder. Members of the group began to run in different directions. However, one of the group, Ernest Brock, after feigning that he was about to put his weapon down, placed his gun in both hands and opened fire on the officers. Lagarde was standing about 15 feet away from Brock when Brock first started shooting. The lighting was good and enabled Lagarde to see Brock's face. Unaware of how many people other than Brock were in the vicinity, Lagarde fired two shots at Brock. Because he was concentrating exclusively on Brock when he fired, Lagarde did not know whether decedent was in the line of fire. After Brock fired a total of three shots at Lagarde and one shot at David, Brock retreated down Dale Street towards Warfield Street waving his weapon at the officers, and firing one additional shot in their direction.
David fired two shots at Brock before Brock retreated.[8] While Brock was backing down Dale Street, the officers heard gunfire coming from both the north and south ends of the street. They estimated a total of about 20 shots were fired. Throughout the gun battle, both officers were frightened for their lives. During the gunfire, young Gordon staggered towards David from across the street and said, "I'm shot". After searching Gordon for weapons and finding none, David protected him from the gunfire. In response to David's question "Who was that crazy man shooting at us?", decedent answered, "Yogi did it."
In pertinent detail Hagen corroborated the testimony of Lagarde and David. Hagen further testified:
(1) Brock fired a shot directly at him;
(2) Brock's weapon sounded like a cannon and looked like a large caliber automatic;
(3) he was "frightened to death"; and
(4) during the shooting he crawled to the Dreamland Lounge to call for help.
The physical evidence collected during two investigations of the scene after the incidenta spent .45 caliber bullet, a bullet graze on the windshield of the brown Oldsmobile, a spent .38 caliber bullet,[9] and three .45 caliber Winchester Wesson shell casingsindicates that the police officers were not the only ones shooting during the incident in suit.
Sergeant Norman Knaps, a police investigator, testified a strike or graze found on the windshield of the brown Oldsmobile could only have been caused by someone shooting in an uptown direction from the location of the dice game. He stated the police officers could not have caused the strike or graze on the windshield because the officers were shooting in a downtown direction from the middle of the street.
Plaintiffs additionally contend on appeal that the defendants' version of the shooting incident is "implausible" for the following reasons:
(1) no weapon was found at the scene;
(2) none of the participants of the dice game were shown to have owned or possessed a gun;
(3) although there were approximately 20 shots fired according to the officers' testimony, not one bullet hole was found at the scene, other than from police weapons;[10]
*240 (4) the prosecution dropped its case against Brock; and
(5) Brock returned to the scene after he allegedly attempted to murder the police officers.
We do not agree with any of these additional plaintiff contentions. If any of the dice-playing group actually had a weapon, and we are convinced that at least one of them did, he would not be expected to leave his weapon at the scene. Regarding the second additional contention, as we have just said, we are convinced at least one member of the group, Brock, did possess and, additionally, fire a hand gun. We find that no bullet holes, other than such as would appear to have been made by .38 caliber ammunition, were found during the investigations of the incident is not significant in light of all of the evidence contained in the record. The two police investigations had been conducted in a hurried manner (hereunder we set forth testimony relative to the hostility of the crowds during the investigations) and it is quite possible that .38 caliber ammunition was used by persons other than the police officers. That the prosecution against Brock was dropped by the district attorney's office (a matter solely within the discretion of the district attorney) is of no significance here because considerations enter into such a determination in a criminal matter which play no part in a civil suit as, for example, in a criminal case the fact that the state must prove guilt beyond a reasonable doubt while in this, a civil case, the burden of proof is upon the plaintiffs. Finally, the fact that Brock returned to the scene does not impress us in any way; and we certainly would not expect him to return while carrying a weapon.
Plaintiffs also point out that the second investigation of the scene was not made until after decedent's death and they argue the evidence produced by the second investigation was gathered and disposed of under these suspicious circumstances, i. e.,
(1) no photographs were taken at the second investigation;
(2) the evidence of the casings was turned in on March 29, 1974, six weeks after the date of the investigation; and
(3) all of the evidence, although described and recorded in the police department's evidence books, was destroyed prior to trial. We are not impressed by these arguments.
Two investigations of the scene were made by the police department. The first began at approximately 9:10 p. m. on the night the incident occurred and lasted approximately 45 to 50 minutes; the second began at approximately 12:25 a. m. the following morning and lasted approximately 35 minutes. Sergeant Norman Knaps, who was assigned to the homicide division, was the commanding officer for both investigations. He testified he was not satisfied with the time consumed in the first investigation and would have stayed "possibly two hours longer" if circumstances had permitted. It is apparent he would have stayed longer in both investigations except for the fact that they were impeded by a hostile, rowdy crowd. His police report states no photographs were taken at the second investigation because he feared a "senseless, and possibly violent, confrontation with the crowd".
As to the above arguments (2) and (3), Lieutenant Kenneth Knapp testified he ordered the destruction of the evidence on October 11, 1975 because it is a routine practice of the department to discard evidence if it is not needed for use in the Criminal District Court. He said that when he ordered the destruction of the evidence he was unaware of the plaintiffs' suit. However, he explained that even if he had known about the plaintiffs' case, he would have still ordered the evidence destroyed because the police department does not have the room to store evidence needed for civil proceedings. Officer Waguespack corroborated Knapp's testimony[11] as to the *241 police department's policy for destruction of evidence. Waguespack also testified it is customary to receive evidence from a policeman six weeks after it is obtained. He explained that evidence is turned over at different times, sometimes late and sometimes early, but generally within two or three weeks.
We accept as correct the testimony set forth in the two immediately preceding paragraphs. Although the rule relative to destruction of evidence may not be the best possible rule under all circumstances, it was nonetheless the rule in effect at the time and the police officers were simply following a rule they were required to follow.
Accordingly, we accept the defendants' version of the manner in which the incident occurred. Our conclusion is that three police officers were fired upon by Brock without provocation after they had gotten out of their automobile and that Lagarde and David returned the fire, shooting at Brock, and young Gordon was inadvertently struck by one of the bullets fired by Lagarde.[12]
Under these facts, Lagarde was shooting with ample provocation; he was shooting to save his own life as well as the lives of his fellow officers. Because he was not the aggressor in the shooting incident, the defense of self defense is available for him to urge against any instigators of the gun battle. Officer Lagarde may not, however, urge the defense of self defense against plaintiffs, because the decedent was not an instigator or aggressor. Stone, 12 Louisiana Civil Law Treatise § 149, 191-94 (1977); Stone, 21 Tul.L.Rev. 368-70 (1947). However, while the "aggressor doctrine" alone will not defeat plaintiffs' claim against Lagarde, plaintiffs still must meet the requirements of La.C.C. Art. 2315 in order to recover. That article requires plaintiffs prove fault on the part of Lagarde. See Anderson v. Clements, La.App., 284 So.2d 341; Whittington v. Levy, La. App., 184 So.2d 577; Davis v. McKey, La. App., 167 So.2d 416, writ refused 246 La. 910, 168 So.2d 822 and writ refused 246 La. 914, 168 So.2d 823; Graham v. Ogden, La. App., 157 So.2d 365. Plaintiffs did not sustain their burden of proving Lagarde was negligent. Under the facts Lagarde acted as a reasonable man, and did not use "excessive force"; his use of his service revolver was justifiable and did not constitute fault. See Patterson v. Kuntz, La.App., 28 So.2d 278; Byrd v. Isgitt, La.App., 338 So.2d 374.
For the reasons assigned, the judgment appealed from is affirmed.
AFFIRMED.
STOULIG, J., concurs with written reasons.
REDMANN, J., dissents with written reasons.
STOULIG, Judge, concurring.
The factual resolution of the conflicting versions of the shooting incident is a credibility determination of the trial judge. Under the mandate of Canter v. Koehring, 283 So.2d 716 (La.1973), not to disturb the factual findings of the trial judge absent manifest error, I concur in the affirmation of the judgment.
I agree with the statement in the dissenting opinion that under the theory of reacting in self-defense the police officers would not be justified in discharging their weapons indiscriminately into a group that includes innocent persons. However, it is my appreciation of the evidence that upon their arrival at the scene and upon identifying themselves as policemen the participants in the dice game and the onlookers scattered and one or more of them began firing at the police. Unfortunately the decedent remained on the scene and became the innocent victim.
*242 The trial judge obviously found the action of the police officers in returning fire not to be unreasonable under the stress of the circumstances.
REDMANN, Judge, dissenting.
All courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation, or other rights. La.Const.1974 art. 1 § 22.
Neither the state, a state agency, nor a political subdivision shall be immune from suit and liability in contract or for injury to person or property. Id. art. 12 § 10(A).
It is one thing to say that a police officer acting as such is immune from personal liability for shooting an innocent bystander to death. It is another thing to say that the innocent bystander has no remedy because his injury was not the result of "fault" (La.C.C. 2315), "negligence . . . or . . . want of skill" (C.C. 2316). Under either saying the policeman is not liable. But if the policeman escapes liability on the theory of immunity, his governmental employer cannot escape liability because the Louisiana constitution expressly prohibits holding the government immune.[1]
The trial judge's and the majority's radical error is that, in their reasonable resolve to protect the policeman from liability (especially for a snap-judgment under fire), they unnecessarily declare that he behaved reasonablywithout fault, negligence or even want of skillin responding to a shot from a crowd of citizens by shooting an inexactly-aimed shot towards the crowd from which the first shot came. Such a declaration is unnecessary because a judgment against the policeman and the city will be collected from the city alone, effectively giving the policeman immunity.

Fault
To categorize the policeman's behavior as non-tortious is unsupportable. It is simply not reasonable to fire a weapon towards a group that includes innocent persons.
A sharp-shooter might justify doing so (as in the case of an airplane hijacking) by reliance on his great skill: but if his skill is insufficient and his bullet strikes an innocent person, Louisiana law, C.C. 2316, declares him "responsible for the damage he occasions . . . [by] his want of skill." One who cannot unerringly direct his bullet into the attacker alone has no business firing towards the crowd.
An added ground of liability of one who fires a bullet which injures an innocent person is one's responsibility under C.C. 2317 "for the damage occasioned by . . . the things which we have in our custody." Under this article the owner of a tree, for example, is responsible for damage caused by its fall; Loescher v. Parr, La.1975, 324 So.2d 441.
Thus, in the absence of some immunity, the individual police officer must be held at fault and liable for plaintiffs' damages, as must the policeman's employer, the city.

Immunity
Immunity of individual police officers for official acts has its merits. Judges are immune from civil liability for judicial acts, even if done maliciously, except "in the `clear absence of all jurisdiction'", Stump v. Sparkman, 1978, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (quoting Bradley v. Fisher, 1872, 13 Wall. 335, 351, 20 L.Ed. 646). But judges' immunity does not extend to all police officers, Pierson v. Ray, 1967, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288; society has a "deep-rooted feeling that the police must obey the law while enforcing the law", Spano v. People of State of N. Y., 1959, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265, although federal officers do enjoy immunity similar to that of judges, Gregoire v. Biddle, 2 Cir. 1949, 177 F.2d 579.
*243 Louisiana appears not to have considered the question whether police officers should enjoy immunity for their torts in the course of official duty. Comment, 1968, 29 La.L. Rev. 130, 143, suggests "imposition of liability on the [governmental] agency together with immunity of the officer" as "the only rational way" to the goals of protecting citizens from both crime and police-caused damage. See also Mathes and Jones, Toward a "Scope of Official Duty" for Police Officers in Damage Actions, 1965, 53 Georgetown L.J. 889, 912, arguing "that the expansion of the official immunity doctrine in recent times makes the individual police-officer liability more the exception or the anomaly to what is really a general rule of public-officer immunity."
The Louisiana Supreme Court has, however, impliedly rejected police immunity, at least for use of excessive force, in Kyle v. City of New Orleans, La.1977, 353 So.2d 969, which nevertheless conceded immunity for damages from false arrest and imprisonment. Several decisions by Louisiana Courts of Appeal have also held police officers liable for their torts while acting as police officers.
Indistinguishable from our case is London v. Ryan, La.App. 1 Cir. 1977, 349 So.2d 1334, writ denied 351 So.2d 171 (La.), where the individual police officer was held liable for shooting the innocent plaintiff in response to a shot from inside the barroom to which the police had been summoned. (Also held liable were the police supervisory officer on the scene and the city itself.)
Other cases in which officer and governmental employer have been held liable include Cheatham v. Lee, La.App. 1 Cir. 1973, 277 So.2d 513, writ denied 279 So.2d 696 (La.), and Taylor v. City of Baton Rouge, La.App. 1 Cir. 1970, 233 So.2d 325, writ refused 256 La. 255, 236 So.2d 32. The Supreme Court has also held liable a governmental employer sued alone for an officer's lack of care of an arrested drunk, in Barlow v. City of New Orleans, 1970, 257 La. 91, 241 So.2d 501.
Accordingly, adoption of police officer immunity is not an option easily available to a Louisiana Court of Appeal, irrespective of its theoretical possibility (despite great constitutional obstacles).
Furthermore, expansion of immunity is both wrong and pointless. Louisiana's constitutional guaranty of remedy for injury and prohibition of governmental immunity proclaim protection that is practical: a substantial judgment against the governmental employer can be collected, and a substantial judgment against the ordinary publice employee cannot. The practical fact is that tortfeasant police officers are joined as defendants primarily to protect against complete dismissal should the tortious act be held outside the course and scope of employment; no plaintiff needs a judgment against the police officer if he has the judgment against the city.
There is a theoretical objection that lack of immunity would enable the city, if cast in judgment, to obtain judgment over against the officer, its employee for whom it is only vicariously liable. If such a third-party demand arises, the courts should deny indemnity to the cityto us, the taxpayerson the ground that the police officer's act, though negligent in the calm view of armchair hindsight, was fully understandable as an intuitive reaction under the pressure and danger into which we (as the city) sent him to protect us and our property. To thus deny the city's demand for indemnity from the officer would afford to the officer the practical immunity from ultimate loss which his importance to our society demands. No more immunity than that is necessary or appropriate.
Certainly the police officer should not be obliged personally to bear the damages an innocent bystander sustains from a shot the officer understandably but unskillfully fires in the reasonable discharge of his official duty.
But neither should the innocent bystander.[2]
NOTES
[1] The bullet recovered during the coroner's autopsy matched Lagarde's service revolver.
[2] Papers from the office of the district attorney, Parish of Orleans, introduced into evidence, indicate the state's case against Brock was dismissed because there was" insufficient evidence to obtain a conviction".
[3] 2 LSA Const. Art. 5, § 5(C) and Art. 5, § 10(B).
[4] 2 LSA Const. Art. 7, § 10 and Art. 7, § 29.
[5] Gonzales v. Xerox Corporation, La., 320 So.2d 163; Miller v. Employers Mut. Liability Ins. Co., La.App., 349 So.2d 1353; Wilkinson v. Travelers Insurance Company, La.App., 330 So.2d 351; Morgan v. Liberty Mutual Insurance Company, La.App., 323 So.2d 855; Palmisano v. Sluch, La.App., 207 So.2d 203; Broussard v. State Farm Mutual Automobile Ins. Co., La.App., 188 So.2d 111 (Writ refused 249 La. 713, 190 So.2d 233, cert. denied 386 U.S. 909, 87 S.Ct. 855, 17 L.Ed.2d 783).
[6] Anthony Bernard's testimony was discredited by his admission that he viewed the incident from behind a pool table directly in front of the open door of the Dreamland Lounge. This is the same open door in the middle of which Shirley Williams testified he was standing. Williams is 5' 10" in height, and was wearing 2" heels at the time in question.
[7] Larry Kennedy admitted he had known the decedent all of his life.
[8] Neither Officer Lagarde nor Officer David saw their bullets take effect nor did they see bullets fired by anyone else take effect.
[9] The .38 caliber bullet had pierced through a home and television cabinet and was found at 4325 and 4327 Dale Street.
[10] This contention is based on the fact that the police officers fired only .38 caliber ammunition.
[11] The transcript erroneously placed Waguespack's testimony under Lieutenant Knapp's name. This error becomes apparent upon reading counsel's comments at 160 of the transcript, Vol. III. See also, 129 of the transcript, Vol. III.
[12] In this connection we note the plaintiffs' version of the shooting incident (that the officers began firing at the dice-playing group without provocation immediately after getting out of their police vehicle) is more "implausible" (as plaintiffs describe defendants' version) than the defendants' version of the incident.
[1] Bridges v. Alaska Housing Auth., Alaska 1962, 375 P.2d 696, held a public agency liable for damages caused by immune employees. See also Lipman v. Brisbane Elem. Sch. Dist., 1961, 55 Cal.2d 224, 11 Cal.Rptr. 97, 99, 359 P.2d 465, 467.
[2] In our civil law forebear France, "the existence of state liability in practically all cases where a private individual is injured by state action tends to all but eliminate the personal responsibility of the officers whose acts caused the damage." Schwartz, Public Tort Liability in France, 1954, 29 N.Y.U.L.Rev. 1432, 1451. Governmental liability for police-caused damage also exists in Quebec: "an innocent victim should not have to support alone the costs of the inherent malfunctions of an activity benefitting the whole population." Giroux, Municipal Liability for Police Torts in the Province of Quebec, 1970, 11 Les cahiers de droit 407, 451. See also Comment, 1932, 42 Yale L.J. 241, 244, describing the "overwhelming opinion throughout the world in favor of the assumption of community liability for the torts of public officers" as "a growing moral conviction to which the Courts should not remain impervious."