SAMUEL, Judge,
dissenting.
Following a rehearing, this matter was reargued before a five judge panel as mandated by Article 5, Section 8(B) of the Constitution of 1974. Those five judges have come to three different conclusions. One would remand, two would affirm, and two would very substantially increase the award. I am one of the two who would so increase.
Despite a timely plaintiff objection, the trial judge allowed the defense to introduce evidence regarding the financial status of the individual defendants and their inability to respond in judgment. In addition, he instructed the jury as follows: “In determining the amount of the damages you may take into consideration the ability or inability of Mr. Bellow and Mrs. Gusse to pay the amount of damages which you award.” No evidence was received regarding defense insurance coverage or the amount thereof, although there was such coverage.[1]
These actions were erroneous. As stated by the Third Circuit in Daniels v. Conn[2]:
“ . . . . While a court may consider the inability of defendant or defendants to respond in judgment, such a rule does not apply in cases in which there is an impecunious defendant liable in solido with a solvent defendant.”
Our settled jurisprudence is that, even where the error committed by the trial court is consequential or prejudicial (as in the admission or refusal to admit evidence, or in instructing a jury, both present here), when the appellate court has all of the evidence before it, such error does not warrant remand and the appellate court must make its own independent conclusion as to the facts revealed in the record and render a judgment on the merits.[3] In my view, as the entire record is before us, we are obligated to proceed to an independent consideration of the facts and to decide accordingly.
As stated in our original opinion, plaintiff was injured in a typical rear-end automobile collision and liability is not an issue. The issues are the extent of the injuries sustained by plaintiff and the amount of damages to which he is entitled therefor.
The principal medical evidence was given by Dr. Kenneth Adatto, an orthopedic surgeon and plaintiff’s treating physician, Dr. Marvin Miller, a psychiatrist, and Dr. Richard Levy, a neurosurgeon who examined plaintiff on behalf of defendants.
*MCCCXLIV The accident occurred on November 3, 1975 and plaintiff was seen by Dr. Adatto on November 11, 1975. His testimony was as follows:
The orthopedic examination revealed spasms in the cervical and lumbar zones and plaintiff was placed on tylenol with codeine for pain, and muscle relaxants. When seen on November 21, 1975, plaintiff had not improved. He requested different medication to relieve the pain. Physical therapy was recommended. On December 5, plaintiff showed slight improvement but was placed on new medication because of his further complaints of pain at this time.
When seen on December 19, plaintiff was much improved and it was suggested he return to work on January 5, 1976. However, he returned on January 9 and 16, because he was getting worse. He was advised to see Dr. Palmer, a neurologist, and to get further bed.rest. On his visit of February 3, plaintiff was still having much difficulty.
Following consultation with Dr. Palmer, who did not rule out a disc, a myelogram was recommended. The myelogram was performed in February, 1976 at St. Charles General Hospital. Defects revealed by the myelogram indicated surgery was advisable and on March 30, 1976 plaintiff was hospitalized and a laminectomy, laminotomy and spinal fusion were performed. Following surgery, plaintiff was discharged April 15, 1976. He was instructed to wear a metal brace for four to six months to protect his back. Plaintiff returned innumerable times thereafter. He was improved on his last visit on January 7, 1977.
In Dr. Adatto’s firm opinion, as a result of the surgery plaintiff will not be able to stoop, lift or bend on a competitive basis, nor will he be able to lift anything over 25-50 pounds for the remainder of his life.
The purpose of fusing is to make the portion a solid fixed structure. However, x-rays showed the operation, in that respect, had not been successful; the fusion was not solid. Dr. Adatto stated plaintiff had a 25% permanent disability of the body as a whole as a result of the aceident. He also testified that when a fusion is not solid another operation may be needed.
Dr. Coleman Schneider, a radiologist, confirmed Dr. Adatto’s finding that the fusion was not solid.
Because of physical problems resulting from the accident, plaintiff became despondent and discouraged and was seen by Dr. Marvin Miller, a psychiatrist, on eight occasions between May 26, 1976 and February 23, 1977. The doctor concluded plaintiff experienced a neurotic depressive reaction as a result of the accident, injuries and subsequent medical events, in short that he had a serious psychiatric problem. He found plaintiff anxious to return to an active, normal life but worried about his inability to do so because his unstable back prevented him from continuing the job he had performed prior to the accident.
Dr. Levy, a neurosurgeon called by the defendants, examined plaintiff on one occasion, January 25, 1977. He was aware of the operation performed by Dr. Adatto. At the conclusion of the neurological examination, Dr. Levy stated plaintiff did not have an active or current disability which would prevent him from doing whatever he wanted to do. He found no neurological abnormality. However, he stated when an individual has a portion of two discs removed, he does have a degree of disability. He estimated plaintiff’s disability as 10-15% partially of. the body as a whole. He confirmed this rating did not include any disability resulting from the spinal fusion, which he admitted was not solid, as disclosed by the x-rays which revealed motion at the L4-L5 and L5-S1 level. I note this is an orthopedic problem and Dr. Adatto, an orthopedic surgeon, was the treating physician.
Susan Smith, qualified as an expert in occupational therapy and vocational evaluation, concluded plaintiff’s physical condition at present, limits him to light work, lifting no more than 15-25 pounds (in line with Dr. Adatto’s thinking), that he cannot sit for long-periods, is unable to work a full 8 hour day, and can at this time work no more than three hours per day. She stated em *MCCCXLV ployers are reluctant to hire people with back problems.
Lay testimony of plaintiff and his mother was to the effect that prior to the accident he had been very active physically, bowling, fishing, doing yard work at home and doing very well in a job which offered future advancement. He has been unable to return to that job since the accident because it requires heavy lifting. This testimony supports the conclusions reached by Dr. Miller, the psychiatrist, and all of the other medical evidence with the sole exception of a part of Dr. Levy’s testimony.
The only evidence regarding loss of wages was given by Dr. Melville Wolfson, an expert in the computation of wage loss and present valuation analysis. Basing his finding on plaintiff’s age (25 years at the time of the accident), annual wage at the time of the accident ($10,234), work life expectancy (an additional 34 years), and. taking into consideration discounting, which Dr. Wolfson explained in detail, he concluded plaintiff’s future wage loss was a minimal of either $159,202 or $165,718 (depending on whether plaintiff would be able to earn a lesser amount than formerly as opposed to not being able to earn any income in the future). These figures do not include what Dr. Wolfson referred to as an improvement factor, and do not take inflation into consideration.
To summarize, the overwhelming preponderance of the evidence is that plaintiff’s injuries from the November 3, 1975 accident resulted in a myelogram in February, 1976, and extensive back surgery in March, 1976, which surgery included a laminecto-my, laminotomy, and spinal fusion. The spinal fusion was unsuccessful and further surgery may be needed to make the fusion solid. Plaintiff was required to wear a metal brace from four to six months. He cannot stoop, lift anything over 20-50 pounds for the remainder of his life, bend on a competitive basis or work at any job which requires such activity. Twenty-six years of age at the time of trial, he is despondent and discouraged by his problems, resulting in a neurotic depressive reaction. All of the testifying doctors state he has a permanent residual physical disability, from an estimated 25% (Dr. Adatto) to 10 — 15% (Dr. Levy). It appears clear this active 26 year old has not, and in all probability will not, be able to continue his recreational activities, or other similar physical activities, for the rest of his life, nor will he be able to engage in the type of remunerative employment for which he is qualified.
The only evidence contained in the record which in any way tends to lessen this sum-marization is the testimony of Dr. Levy, which testimony is further discussed later in this dissent.
The judgment appealed from awards plaintiff a total of $25,000. However, it also includes payment of $12,539.06 by preference to a workmen’s compensation insurer for medical and compensation benefits paid by that insurer to the plaintiff as a result of his injuries. Thus, plaintiff actually receives only $12,460.94 for all damages resulting from the accident including the serious operations, loss of wages both past and future, his residual physical and mental condition, the possible future surgery, all special damages, and pain and suffering. The stipulated or proven special damages are $6,504.06 in medical expenses, $12,462 in loss of wages to trial, and a minimum of $159,202 in loss of future wages, or a total of $178,568. This figure does not include expenses for future possible surgery. Thus, the $12,460.94 award actually received by plaintiff does not even approach the stipulated or proven specials to which he is entitled nor, as has been said, does it include an award for his pain and suffering or permanent residual disability, both physical and mental.
Insofar as Dr. Levy is concerned, I simply do not believe his testimony that this plaintiff, who had undergone such serious back surgery, including an unsuccessful fusion which was not solid, did not have an active or current disability which would prevent him from doing whatever he wanted to do. It should be noted that Dr. Levy saw the plaintiff only on one occasion. His testimony is restricted to his field of neurology and, despite his conclusion, he still estimated plaintiff’s disability as 10 — 15% of the body as a whole. However, even if this doctor’s testimony were accepted, the net *MCCCXLVI award of $12,460.94 is obviously inadequate. With such acceptance, the award still would be $6,505.12 less than the stipulated or proven medical expenses already incurred ($6,504.06) and the actual loss of wages to the time of trial ($12,462.00), a total of $18,966.06. Certainly, even considering only plaintiff’s physical and mental injuries and the surgery he had undergone, he is entitled to an award for pain and suffering in a very substantial amount. Instead of any such award for any amount, he has received less than nothing. Under any consideration, he has received less than his proven and undisputed special damages.
In my view, affirmance of the trial court judgment results in an award to plaintiff so totally and completely inadequate as to constitute a miscarriage of justice. I trust the Supreme Court will review the matter.
For the reasons assigned, I respectfully dissent.

. The defendant vehicle was insured by Allstate Insurance Company with a liability limit of $50,000. Excess insurance apparently in the amount of several hundred thousand dollars is offered under the uninsured motorist provisions in several policies issued to plaintiffs employer by State Farm Mutual Automobile Insurance Company.

. No. 7153 of the docket of the Court of Appeal, Third Circuit, State of Louisiana, - So.2d -, 1979.

. Gonzales v. Xerox Corporation, La., 320 So.2d 163; Temple v. Liberty Mutual Ins. Co., La., 330 So.2d 891; Gordon v. City of New Orleans, La.App., 363 So.2d 235. The rule is stated in Gonzales v. Xerox Corporation, at page 166, as follows:
“When the entire record is before the appellate court, remand for a new trial produces delay of the final outcome and congestion of crowded dockets while adding little to the judicial determination process. Although the appellate court does not gain the benefit of personally viewing the witnesses, it does have a complete record and the constitutional authority to decide.”