284 So.2d 341 (1973)
Henry C. ANDERSON
v.
Henry CLEMENTS et al.
No. 5584.
Court of Appeal of Louisiana, Fourth Circuit.
August 7, 1973.
Rehearing Denied November 2, 1973.
*342 David E. Caruso, Jr. and Frederick J. Gisevius, Jr., New Orleans, for plaintiff-appellant.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, James R. Murrell, III, and John J. Weigel, New Orleans, for defendants-appellees.
Before SAMUEL, BAILES and FLEMING, JJ.
SAMUEL, Judge.
This is a suit to recover damages for personal injuries sustained when plaintiff was struck by a bullet while he was a patron of a poolroom. Named as defendants are: Major Lanes, Inc., owner of the combination poolroom-bowling alley; Travelers Insurance Company, liability insurer of Major Lanes; and Henry Clements, the employee of Major Lanes who fired the shot which struck the plaintiff.[1]
After trial on the merits, judgment was rendered in favor of Major Lanes and Travelers, dismissing the suit as to those two defendants. Although Clements did appear as a witness, he had not been served and no judgment was rendered with regard to him. Plaintiff has appealed.
Plaintiff's injury occurred on October 5, 1966, at about 5:30 p. m. or shortly thereafter. Clements was employed by Major Lanes as a racker in the poolroom. His chief function was to rack the balls after each game and collect a fee which amounted *343 to five cents per person per game. His compensation was 25% of all amounts collected by him.
On the evening in question he came to work shortly after 5 p. m. At that time plaintiff was engaged in a pool game with Simon Washington, whom plaintiff had not known previously. After the game was over Clements inquired as to the winner and asked Washington, who had lost, to pay the ten cents fee for the pool table. Washington refused to pay and Clements then requested Oliver White, the day manager of the establishment, to assist him in collecting the money. White talked to Washington alone and gave him the ten cents to pay Clements. When Washington returned to the pool table Clements refused to accept the money and refused to allow Washington to continue playing. Some words were exchanged between the two men and Washington left the premises.
After being told by a customer that Washington was coming back to "cause trouble", Clements went to a room available to the employees, there obtained a .25 caliber automatic (owned by another employee), and placed the gun in his belt under his shirt. He then proceeded to carry on with his job. Washington returned to the premises before 6 p. m.
All of the testimony clearly establishes that Washington returned to the premises with a butcher knife or meat cleaver held behind his back. He approached Clements who pointed the gun at him and warned him not to come any closer. When Washington brandished the knife over his head and continued to advance in an obvious attempt to harm Clements, Clements shot Washington three times in the chest, killing him. One of the shots struck the plaintiff in the genital organs and caused him to fall to the floor.
It is undisputed that when Clements was informed Washington was coming back to the poolroom to "cause trouble", he neither told plaintiff or the other patrons then in the room that trouble was imminent or possible, nor did he call the police. Instead his only action was to arm himself by concealing the gun.
Oliver White was employed by Major Lanes as a day manager. His hours were from 7 a. m. to 5 p. m. He had left the premises prior to the shooting incident. Part of his duties included keeping order on the premises. He had been instructed to call the police in the event of a disturbance, since the security guards hired by Major Lanes did not come on duty until 6 p. m. He testified that between 5 p. m., when he left duty, and 6 p. m., when the security guards came on duty, Clements was in charge of the poolroom and a Theodore Smith was in charge of the bowling alley which was also part of Major Lanes' operation. Smith was regarded as the night manager. Both he and White confirmed the fact that Smith had no control over the poolroom, and that whatever racker was working there was in charge of that operation.
The testimony of John Hooper, the owner of Major Lanes, is significant because he confirmed that fact that if White left the premises it was understood Clements would be in charge of the poolroom. He stated he instructed White to delegate the duties, and it was expected that Clements would have handled disturbances at a time when White was not on the premises. He did state, in the event of trouble, he had instructed Clements to call White or the police during the day or a security guard on the premises at night. He emphasized that he had forbidden the use of firearms by his employees, he had no knowledge of the firearm used by Clements in this matter, and he had told his employees to use billiard sticks as weapons should an altercation occur.
As stated in his reasons for judgment the trial court found the following facts: Clements was not at fault in the argument with Washington; the gun which Clements obtained was owned and placed on the premises by one of his co-employees; the defendant company had a policy against *344 possession of firearms by any employees; the defendant company had no knowledge that any gun was kept on the premises; there was no security guard on the premises at the time of the shooting, the day security guards previously having been discontinued for financial reasons; Clements did not call the police before the shooting, and Clements gave no warning to the plaintiff or to any other person that he was armed. We agree with these findings of fact. We also agree that, other than such as may be attributable to Clements, the record shows no negligence on the part of the defendant company.
However, we are of the opinion the legal conclusion which the trial court drew from these findings of fact is in error. If Clements was guilty of negligence proximately causing the injury in suit, and if his negligence took place in the course and scope of his employment, his employer and its insurer are liable for his actions under the doctrine of respondeat superior.
The basic duty owed to a patron by an establishment such as that of the defendant was set forth in De Hart v. Travelers Insurance Company,[2] which involved an assault upon a patron by another patron while the owner of the coffee house in which the assault took place was absent from the premises. There the court stated that while the proprietor of a public place is not the guarantor of his patrons' safety, he owes them a duty to exercise reasonable care to protect them from harm at the hands of a fellow-guest or at the hands of his employees; such a proprietor owes a duty to guests to protect them from insult, annoyance and danger, and his guests have a right to rely on the belief they are in an orderly house and are protected from injury by the exercise of reasonable care for their safety by the operator of the establishment or his representative.
Under our law part of the duty imposed on those in charge of a business establishment if time allows, is to call the police in the event of a disturbance in order to prevent injury to patrons. In Matranga v. Travelers Insurance Company,[3] wherein liability was imposed on the owner of a barroom, the court made the following statement:
"It is the duty of every storekeeper and restaurant operator to use reasonable care in the protection of his patrons and guests. Particularly, must he, himself, refrain from any act or conduct likely to cause injury to a guest. Had the argument been between two other guests rather than between the proprietor and his brother, who had been assisting him in the restaurant at the time, it would have been defendant, Zibilich's duty to eject the offenders or called [sic] for the police. Under the circumstances, defendant, Zibilich's conduct constituted negligence." (Emphasis ours).
The duty to call the police if time allows was recognized in Rodney v. Mansur,[4] where the court stated the person in charge of an establishment, such as the one in this suit, has the duty to call the police in the face of danger in order to protect patrons of the establishment and that failure to comply with this duty would impose liability. However, the court refused to apply the principle for the reason that the person in charge of the business did not delay a sufficient amount of time in calling the police to justify imposing liability.
In the instant case, in spite of the warning he had received, a warning obviously taken seriously as shown by his action in arming himself, Clements did not call the police nor did he warn the patrons in the poolroom of the impending or possible danger or of the fact that he was armed *345 and prepared to shoot someone he had reason to believe would attempt to cause him bodily harm. All he did was arm himself. As Washington was away from the premises for approximately shortly less than thirty minutes, Clements had sufficient time to call the police and warn the patrons. In view of the short time between receipt of the information that Washington would return and "cause trouble" and Washington's return, a period of time so short as to make a police response thereto highly unlikely, and also in view of the fact that a security guard was expected to arrive momentarily, we attach no great importance to Clements' failure to call the police. However, his failure to warn the patrons, including the plaintiff, of the impending, or possibly impending, danger violated the duty of an operator of a public place to use reasonable care in the protection of his patrons and guests, and constitutes negligence on his part.
Defendants make several arguments which can be reduced to two basic propositions. They contend: (1) Clements was justified in his actions because he acted in self-defense; and (2) Clements did not act within the course and scope of his employment with Major Lanes.
In support of their first argument the defendants urge a quotation from Whittington v. Levy,[5] in which the court made the following statement:
"Even if Whittington had been an innocent bystander he could not recover from Albano because the latter acted reasonably in repelling the assault of Musmeci.
`If, in defending himself, the defendant accidentally shoots a stranger, there is no liability in the absence of some negligence, and on the issue of negligence, the necessity of defending against the assailant must be considered in determining whether he has acted reasonably. The same policy which gives the defendant the privilege of acting under a reasonable mistake, protects him in such a case.' Prosser on Torts 2d Ed. p. 91." (Emphasis ours).
The foregoing quotation from the Whittington case shows that Prosser makes an exception to the rule by qualifying the right to injure an innocent third person in defending one's self with the limitation that there must be an "absence of some negligence . . ." As has been pointed out, Clements was negligent in failing to warn the plaintiff of the impending danger of a shoot-out. Consequently, while the right of self-defense would be available as against Washington or his heirs, it is of no avail insofar as the present plaintiff is concerned.
The defendants strenuously argue their second defense, that the actions of Clements were outside the course and scope of his employment. However, as also has been pointed out, all parties concerned, Clements, the day manager White, and the owner of the defendant company, concede that when White, a security guard, or the owner were not on the premises, Clements was in charge of the poolroom and had the responsibility of handling disturbances.
In Howard v. Hardware Mutual Casualty Co.,[6] the court held that a negligent shooting by the manager of a service station imposed liability on his employer even where the negligence was of such a gross nature as to imply intent. The court held that when a person is placed on the premises of a public establishment and charged with keeping order, even excessive force by such a person is within the course and scope of his employment, thereby making his employer liable under the doctrine of respondeat superior. Here there is no reasonable ground for arguing excessive force was used by Clements.
*346 In the present case it is clear that at the time of the incident in suit Clements was the only person on the premises with any responsibility for the poolroom. As racker he was in charge of managing the affairs of the room and of collecting its revenues. The day manager had gone, the security guard had not arrived, and the night manager (who had arrived and was handling the cash register) had no authority over him. Clearly, in such a situation one of the duties required of Clements as an employee was to keep order on the premises, and his actions in keeping order were in the course and scope of his employment. Consequently, his negligence, particularly in failing to warn the patrons present, including the plaintiff, that he was armed and that a possible shooting was imminent, was imputable to his employer and its insurer and imposes liability to the plaintiff on them.
The nature of the plaintiff's injuries and the lack of awards for similar injuries makes difficult a proper assessment of damages. The bullet which struck the plaintiff entered the upper dorsal side of the penis, tore through the urethra, or urinary passage, and lodged in the bottom of the penis. He was taken to Charity Hospital. Because of his salary, it was determined he could not be treated at Charity so he was taken to Ochsner Foundation Hospital where emergency surgery was performed. Spinal anesthesia was administered, the bullet was removed and the wound was stitched closed. However, there was a scrotum contusion, which was enlarged and sensative. In the course of repairing the torn urethra, it was necessary to divert urine in order to prevent infection. This was done by making an incision in the plaintiff's lower abdomen and inserting a catheter in his bladder. The catheter emptied into a bag, which the plaintiff was required to wear strapped to his leg for approximately three months. He was given antibiotics to help prevent infection and was discharged from the hospital on October 13, 1966, eight days after his injury.
By December 13, the Ochsner physicians felt the area had healed adequately, and they performed a urethrogram, which showed sufficient healing without evidence of fistula formation. Some necrotic tissue sloughed off and there was urine leakage through the slough area until approximately November 8, 1966. The catheter had to be changed occasionally. He was last seen on March 28, 1967 when it was determined that his residual damage was an area of scar tissue on either side of his penis together with the depression or indentation which the doctor referred to as a "small dimple". Because of the tear to the urethra, he was advised to be checked on an annual or biannual basis in order to prevent a fistula urethra stricture, which could possibly develop at any time during his later life and cause restricted flow of urine. The plaintiff was approximately 21 years of age at the time of his injury.
In addition to his medical expenses of $718.37, it is the opinion of the court that the plaintiff is entitled to an award of $7,500 for his pain and suffering. We have found few cases which are at all comparable. In Coleman v. Danos,[7] the court awarded the sum of $2,000 to a man who sustained a puncture in his groin in an automobile accident. Surgical repair required approximately an hour, with painful probing in the wound by the treating physicians. He remained in the hospital for a period of five weeks, required sleeping pills, and suffered some pain for several weeks after his discharge from the hospital. There is no mention of the application of antibiotics or of sophisticated surgical techniques, apparently for the reason that the case was decided in 1939. A more recent case is Ratcliff v. United Services *347 Automobile Association,[8] where a young man sustained substantial rectal injuries from being impaled on a metal stud in a boat. The court there awarded $5,000 for pain and suffering.
For the foregoing reasons, the judgment appealed from is reversed and it is ordered that there be judgment in favor of the plaintiff, Henry C. Anderson, and against the defendants, Major Lanes, Inc. and Travelers Insurance Company, in solido, in the full sum of $8,718.37, with legal interest thereon from date of judicial demand until paid. Defendants-appellees are to pay all costs in both courts.
Reversed.
In this matter defendants-appellees have filed an application for a rehearing in which they call our attention to the fact that we made an error in computation. The point is well taken. The amount awarded, $8,718.37, is erroneous. As the medical expenses were $718.37 and the award for pain and suffering was $7,500, the total award should be the sum of $8,218.37.
Accordingly, our original decree is now recast so as to read as follows:
"For the foregoing reasons, the judgment appealed from is reversed and it is ordered that there be judgment in favor of the plaintiff, Henry C. Anderson, and against the defendants, Major Lanes, Inc. and Travelers Insurance Company, in solido, in the full sum of $8,718.37, with legal interest thereon from date of judicial demand until paid. Defendants-appellees are to pay all costs in both courts."
As we adhere to our original opinion, the application for rehearing is refused.
Decree recast; Rehearing refused.
NOTES
[1] Harry Clements was erroneously named as Henry Clements in the suit.
[2] La.App., 10 So.2d 597.
[3] La.App., 55 So.2d 633.
[4] La.App., 219 So.2d 305.
[5] La.App., 184 So.2d 577.
[6] La.App., 253 So.2d 555.
[7] La.App., 186 So. 407.
[8] La.App., 180 So.2d 58.