445 So.2d 756 (1984)
Henry HARRIS, et al.
v.
PIZZA HUT OF LOUISIANA, INC. et al.
Nos. CA 0739, CA 0740.
Court of Appeal of Louisiana, Fourth Circuit.
January 12, 1984.
Writ Granted March 23, 1984.
Charles A. Boggs, Chester A. Fleming, III, Boggs, Loehn & Rodrigue, New Orleans, for defendants-appellants.
Charles R. Jones, and John S. Keller, New Orleans, for plaintiffs-appellees.
Before REDMANN, SCHOTT and CIACCIO, JJ.
CIACCIO, Judge.
Plaintiffs are the husband and children of Valletter Harris. Mrs. Harris was killed by a shotgun blast fired by one of the robbers during the perpetration of an armed robbery of a Pizza Hut. Plaintiffs instituted this wrongful death action against Pizza Hut and its insurer, St. Paul Fire and *757 Marine. Zina Harris, one of the children, was injured during the robbery and also sued Pizza Hut and St. Paul Fire and Marine to recover for her personal injuries.
Plaintiffs alleged that Valletter Harris' death and Zina Harris' personal injuries resulted from the negligence of the security guard on duty at the time of the robbery. Pizza Hut defended the suit by arguing that the security guard, an off-duty uniformed New Orleans police officer, did not act negligently and that his actions did not cause the injuries involved. Rather, Pizza Hut argues, the injuries resulted from a spontaneous violent criminal act for which Pizza Hut should not be held responsible.
Responding to interrogatories, a unanimous jury returned a verdict in favor of the plaintiffs. The jury responded affirmatively that the security guard had been negligent and that his negligence was a cause-in-fact of the harm suffered. The jury then gave awards to Zina Harris for her personal injuries and to each of the children for the loss of their mother. The jury did not give any award to Mr. Harris, perhaps because Mr. and Mrs. Harris were separated at the time of her death.
Defendants have appealed, arguing that the jury verdict is clearly wrong in finding defendants liable. Further, defendants argue that the trial court committed reversible error by failing to properly instruct the jury. Plaintiffs argue that the judgment should be affirmed. After careful review and consideration, for the reasons that follow, we reverse.
Shortly after 9 p.m. on a Saturday evening, March 17, 1979, New Orleans Police Officer Maxie Walker arrived in uniform at the Pizza Hut on the corner of Port St. and Claiborne Avenue. Officer Walker had been employed by Pizza Hut to work as a security guard from 9 p.m. until 1 a.m. on this evening. Subject to police department approval, working paid off-duty details was a common practice among New Orleans police officers. Officer Walker had worked this detail at Pizza Hut before.
Upon arriving at the Pizza Hut, Officer Walker informed the manager that he would be working until 1 a.m. Officer Walker then fixed a salad and a soft drink and sat facing the entrance at a table near the entrance, eating his salad. After a short time Officer Walker was joined by Dewayne Thomas, a fifteen year old who frequented the Pizza Hut and occasionally did odd-jobs for pay at the request of the manager.
Some time before 10 p.m. Valletter Harris, three of her children and Mr. Louis Rogers entered the Pizza Hut as patrons. They sat at a table located one row farther from the entrance and two tables behind the table where Officer Walker was seated.
At approximately 10 p.m. an armed robbery occurred at the Pizza Hut. One of the robbers entered with a sawed-off shotgun and standing across the table from Officer Walker, leveled the shotgun at the officer and instructed him not to move. Gunfire erupted during the course of the robbery. A single blast from the sawed-off shotgun killed Valletter Harris and injured Zina Harris and Officer Walker. Officer Walker shot and killed one of the robbers and wounded another. The wounded robber was later apprehended. A third robber escaped from the scene and was never apprehended. No one else was injured of the twenty to thirty people estimated to have been in the Pizza Hut at the time of the robbery.
The trial testimony was fairly consistent concerning the circumstances and events prior to the robbery. The testimony concerning what occurred during the robbery, however, was irreconcilably conflicting.
Officer Walker, Dewayne Thomas and several other witnesses testified that shortly after the robber entered he unexpectedly fired the shotgun, whereupon Officer Walker returned fire. Officer Walker believed that the robber he had killed had been the one with the shotgun, and Dewayne Thomas was "positive" that the dead robber shown in police photographs from the night of the crime, was the one who wielded the shotgun. Moreover, photographs *758 of the shotgun taken immediately after the crime show that the shotgun was next to a foot, identified as the dead robber's from the photographs of his body, perhaps a half a block away in a different direction from that of the wounded robber's flight, according to his testimony. The robber Officer Walker wounded testified, however, that he had been the robber with the shotgun, and that he left it at the door of Pizza Hut. In any case, he and two other witnesses testified that Officer Walker fired first and in response the shotgun was fired.
Initially we note that decisions involving injuries inflicted upon a business patron by an unknown assailant typically deny any recovery to the patron. In Pennington v. Church's Fried Chicken, 393 So.2d 360 (La.App. 1st Cir.1980), the First Circuit Court of Appeal denied recovery for personal injuries to a patron of a fast-food outlet who was injured when her purse was stolen while she was waiting in line. The court held:
The duty to protect business patrons does not extend to the unforeseeable or unanticipated criminal acts of an independent third person. The owner or management does have a duty to protect patrons when it has knowledge, or can be imputed with knowledge, of the third person's intended conduct.
Similarly, the court in Roberts v. Tiny Tim Thrifty Check, 367 So.2d 64 (La.App. 4th Cir.1979) denied any recovery against a convenience store proprietor for the death of a patron using the telephone, who was shot during a hold-up attempt. There are numerous other instances of denials of recovery against the operator of a business for injuries inflicted upon a patron by an unexpected assailant. See: McKinney v. Louisiana National Bank, 416 So.2d 948 (La.App. 1st Cir.1982); Guidry v. Toups, 351 So.2d 1280 (La.App. 1st Cir.1977); Hodge v. St. Bernard Chapter No. 36, 338 So.2d 934 (La.App. 4th Cir.1976); Rodney v. Mansur, 219 So.2d 305 (La.App. 1st Cir. 1969); Callender v. Wilson, 162 So.2d 203 (La.App.1st Cir.1964).
Trial evidence established that this Pizza Hut had been robbed on several previous occasions. The parties agreed that, if the prior robberies created a duty for Pizza Hut to provide extraordinary security for its patrons, this duty had been satisfied by hiring a trained, uniformed, armed, local police officer as a security guard. The critical issue remaining is whether the police officer/security guard was negligent so as to establish liability for the harm suffered by plaintiffs.
In determining negligence liability the courts of this State have adopted a duty-risk analysis approach. See: Dixie Drive It Yourself System of New Orleans Co. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962); Pierre v. Allstate Insurance Co., 257 La. 471, 242 So.2d 821 (1970); Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972). The Third Circuit Court of Appeal has expressed agreement with Professor Stone's comments and observation in his Tort Doctrine, Louisiana Civil Law Treatise, Volume 12, that the process of analysis to determine negligence liability as developed by the courts is, in the end, often only a matter of reaching court policy in a given situation; that is, the finding of negligence is a decision made by the courts to extend the protection of the law to exposure to certain risks. See: Tilley v. Mount Vernon Insurance Company, 411 So.2d 72 (La.App. 3d Cir.1982). In Hill v. Lundin & Associates, Inc., supra, the Supreme Court summed up the concept in these words:
"Where the rule of law upon which a plaintiff relies for imposing a duty is based upon a statute, the court attempts to interpret legislative intent as to the risk contemplated by the legal duty, which is often a resort to the court's own judgment of the scope of protection intended by the Legislature. Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298; Pierre v. Allstate Ins. Co., [257 La. 471, 242 So.2d 821] supra. Where the rule of law is jurisprudential and the court is without the aid of legislative intent, the process of determining the risk encompassed *759 within the rule of law is nevertheless similar. Malone, Ruminations on Dixie Drive It Yourself, 30 La.L.Rev. 363 (1970); McDonald, Proximate Cause in Louisiana, 16 La.L.Rev. 391 (1956). The same policy considerations which would motivate a legislative body to impose duties to protect from certain risks are applied by the court in making its determination. `All rules of conduct, irrespective of whether they are the product of a legislature or are a part of the fabric of the court-made law of negligence, exist for purposes. They are designed to protect some persons under some circumstances against some risks. Seldom does a rule protect every victim against every risk that may befall him, merely because it is shown that the violation of the rule played a part in producing the injury. The task of defining the proper reach or thrust of a rule in its policy aspects is one that must be undertaken by the court in each case as it arises. How appropriate is the rule to the facts of this controversy? This is a question that the court cannot escape.' Malone, Ruminations on Cause-In-Fact, 9 Stanford L.Rev. 60, 73 (1956)."
The duty relied upon by plaintiffs is one of the exercise of reasonable care by Pizza Hut for the safety of its patrons. This duty was articulated in Roberts v. Tiny Tim Thrifty Check, supra, and reiterated in Pennington v. Church's Fried Chicken, supra, as follows:
"A store owner is under a duty to take reasonable care for the safety of his patrons, but he is not the insurer of their safety. Anderson v. Clements, 284 So.2d 341 (La.App. 4th Cir.1973); DeHart v. Travelers Ins. Co., 10 So.2d 597 (La. App.Orl.1942); Matranga v. Travelers Insurance Co., 55 So.2d 633 (La.App.Orl. 1951). It has also been stated that a proprietor of a public place has a duty to protect his patrons from injuries at the hands of third parties when it is within his power to do so. Cooper v. Ruffino, 172 So.2d 717 (La.App. 4th Cir.1965)." Plaintiffs also rely on the argument that injury to a patron during an armed robbery is a foreseeable risk. We note that while forseeability is a consideration, it is not the only criterion to be considered. Whether or not the risk falls within the scope of the duty owed must be determined by the court on a case-by-case basis, with each court weighing the policy factors it considers important. Ronstadt v. Begnaud Motors, Inc., 427 So.2d 911 (La.App. 3d Cir.1983).
Plaintiffs argue that Officer Walker was negligent during two periods in time and that these periods of negligence, either separately or together, give rise to liability for the harm suffered by plaintiffs. The first period is that span of time preceeding the robbery. The second period involves the shortened time frame during which the shotgun was fired.
Plaintiffs' argument concerning the first time period is premised upon the concept that a security guard should deter crime. Further, a security guard properly functioning as crime deterrent may, perhaps, have prevented the robbery from occurring, thus, preventing any injuries sustained during the robbery. We find that, whatever a security guard's responsibilities toward crime deterrence, the quality of Officer Walker's performance prior to the robbery did not cause the robbery, much less cause the robber to fire the shotgun. In duty-risk terms, if it may be said that the presence of a visible armed guard outside the door would have discouraged the robbers from attempting the robbery, it still may not be said that Pizza Hut had a duty to station a guard there or that the guard had a duty never to go inside, for example, to eat something.
Trial testimony indicated that the robbery had been planned some days in advance of its execution. Although the robber testified that he did not expect to find a security guard on duty, the evidence does not establish that Officer Walker could have prevented the robbery. Further, *760 whatever did cause the robber to pull the trigger on the shotgun is too far removed from any pre-robbery events for us to hold that the actions of Officer Walker prior to the robbery can form the basis of any liability for the harm caused by the shotgun blast.
Plaintiffs' second argument is that once the robbery was in progress and the robber had pointed the shotgun at Officer Walker, the actions of Officer Walker during those moments were what caused the robber to fire the shotgun. The robber testified that he intentionally pulled the trigger on the shotgun. That is, he did not accidentally fire the weapon. The robber claims he fired the shotgun only after Officer Walker had first fired at him.
The buckshot fired from the shotgun was the direct and immediate agent of the entirety of harm suffered by plaintiffs. It is clear that, alone, the actions of Officer Walker did not bring about plaintiffs' harm. The robber had to pull the trigger on the shotgun before any harm could come to the plaintiffs.
As mentioned previously, the testimony is contradictory concerning Officer Walker's actions while the robber had the shotgun aimed at him. We can only speculate as to what the jury found, or even whether it made a factual finding, concerning this moment during the robbery. We know only that the jury thought that at some point during the evening Officer Walker was negligent, and, that his negligence, whatever it might have been, was a cause-in-fact of the plaintiffs' harm. Of course, a finding of cause-in-fact does not by itself establish liability. Shelton v. Aetna Casualty and Surety Company, 334 So.2d 406 (La.1976).
We have carefully reviewed the testimony concerning what occurred during the robbery. We find the evidence supports Officer Walker's version; that is, when the robber pointed the sawed-off shotgun and said "Don't move", Officer Walker did not move or draw his pistol until after the shotgun was fired. What prompted the robber to fire the shotgun is unclear, although it may have been the movement of Dewayne Thomas, who was standing next to Officer Walker and dove to the floor in fear of the robber and the shotgun. We find that Officer Walker did not fire first and that the robber fired the shotgun without provocation. Our finding is supported by testimony, which contained no significant inconsistencies, from Officer Walker, Dewayne Thomas and three other witnesses who were in good positions to observe the action.
Officer Walker described the sequence of events preceding the gunfire:
"Well, he approached the table approximately four feet away from me with the shotgun leveled point blank at me and said don't move pig. At that time I just knew that he was going to blow my head off my shoulders. He was definitely going to kill me. I definitely felt I was going to die at that time. A second later, a second, a second and a half later, Dewayne Thomas suddenly moves away from the table, which seemed to have agitated this subject with the shotgun, because he told me not to move and I wasn't moving, you know, I had my hand on my gun at the time and I didn't even want to take my hand off the gun and place it on the table, I didn't want to give him any indication that I was going to try and return fire at him. Dewayne Thomas suddenly moved away from the table, this agitated this subject more with the shotgun and he became nervous and he fired a shot striking me in the shoulder and the remaining pellets went past me killing the lady Valleter Harris." [Tr.Vol. IX pp 48-49.]
Dewayne Thomas recalled the incident:
"Q. Where were you in relationship to Officer Walker?
A. Right across from him.
Q. Where was the robber in relationship to you and Officer Walker?

*761 A. A couple of feet away.
Q. Were you between Officer Walker and the robber?
A. At one point I was.
Q. At what point was that?
A. When the guy first walked in the door.
Q. All right. What did you do after he yelled don't move pig?
A. I stepped back and I dove for the floor.
Q. What happened after that, Mr. Thomas?
A. When I dove for the floor the guy with the shotgun fired.
Q. Now, how do you know that?
A. As I was going down I saw the fire jump out of the shotgun.
Q. And as you were jumping out where was Officer Walker?
A. In his chair." [Tr.Vol. X, pp. 54-55]
Keith Watson corroborated that the robber fired first:
"A. Okay. Me and the guy I came in with to the Pizza Hut, we had just left the counter, walked back to the table, the lady who worked in the place, she came back and asked us to place our order. Okay. As we were giving our order to her a guy came in with a shotgun to the counter, he didn't notice the police officer was sitting at the table, turned and fired, hitting the lady next to me at the next table, hitting her in her face. At this time the officer was sitting at the table going to the floor drawing his revolver and shooting back.
Q. All right. The first shot was fired by the robber, is that correct?
A. Yes.
Q. After the first shot was fired by the robber what happened?
A. The officer fell to the floor.
Q. Now, before he fell to the floor, Mr. Watson, had he drawn his gun?
A. No.
Q. When he was shot at where was his gun?
Where was his gun when he was first shot at?
A. In his holster." [Tr.Vol. X pp. 44-45]
Daniel Brown was seated facing the doorway and could see Officer Walker's back. He related what he observed:
"Q. Would you tell the ladies and gentlemen of the jury, Mr. Brown what you witnessed on that day?
A. Well, me and a friend, we came in, we ordered a pizza, all right, the lady told us to sit at the table, it would be about twenty minutes, we ordered some beer. All right. She was bringing us a pitcher of beer and I seen one guy come in the door with something on his face, he went toward the counter, I seen the second guy some in the door, turn and shoot.
. . . . .
Q. The person that you saw come into the restaurant, was he carrying anything?
A. He had a shotgun in his hand.
Q. Now, after he came into the restaurant with a shotgun in his hand what did he do with it?
A. He turned and he shot.
Q. All right. Who did he shoot at?
A. He shot at the officer that was sitting at the table.
Q. All right. And would you describe for the ladies and gentlemen of the jury what happened after the gun was trained on the policeman?
A. After the gunman shot the policeman returned fire.
. . . . .
Q. After the policeman was shot at what did he do?
A. He returned fire." [Tr.Vol. X pp. 9, 10, and 13]
Janice Edwards also testified that the robber fired first:

*762 "A. Then another guy walked in and he had a rifle and he said something, I don't really remember what he said, pig, police, something, I don't know, but when he saw the policeman he started shooting. I do remember that.
Q. And who was he shooting at?
A. The policeman.
Q. Ms. Edwards, let me show you what purports to be a diagram of the Pizza Hut, this has been identified as Harris 19, would you take a minute to get familiar with it, this being the front door, that being the salad bar and this being the counter area. Are you familiar with it, ma'am?
A. Yes.
Q. All right. Miss Edwards, would you tell the ladies and gentlemen of the jury where you were sitting, what table you were sitting at?
A. E-3.
Q. E-3. All right. That would be all the way against the side of the restaurant where the door is, is that correct?
A. Yes, sir.
Q. And which way were you facing, Miss Edwards?
A. Toward the door.
Q. All right. So you had a good view of what was going on, is that correct?
A. Yes, sir.
Q. Now, where was the policeman sitting, Ms. Edwards?
A. D-2.
Q. All right. Did you observe the policeman at the time this was occurring, did you see him, too?
A. Yes, I could see him.
Q. Did he move before he was shot at?
A. No.
Q. Where was his gun when he was shot at?
A. I would assume in his holster.
Q. Did the police officer shoot first or did the armed robber shoot first?
A. The armed robber.
MR. KELLER:
Objection, Your Honor.
BY MR. BOGGS:
Q. Who shot first?
A. The robber.
Q. After the robber shot what did the policeman do?
A. It was kind of chaotic then, okay, we were going on the floor when they started shooting and I remember the guy shooting first and then the policeman returned his fire and I think he was telling everybody to get on the floor, too.
Q. The policeman was telling everybody to get on the floor?
A. Yes." [Tr.Vol. X pp. 27-29]
Even assuming that the robber who testified was the robber with the shotgun, his alternative version, that he returned the fire of Officer Walker, is virtually uncorroborated. The two witnesses whose testimony appears to lend support to the robber's version, were not in good positions to observe what happened. The line of sight of one of these witnesses, a thirteen year old girl, was obscured by the salad bar, preventing her from having a full view of either the robber or Officer Walker. She did not even recall the salad bar, although every other witness testified as to its existence and its location between the girl and Officer Walker, and photographs confirm their testimony. The other witness, a young man who was standing at the counter waiting for a pizza, testified that at the time the shots were fired his back was to the action and he was running toward the bathroom. His testimony as to who fired first was based on what he heard as, obviously, he did not see what happened.
Having found that Officer Walker did not fire first and that the robber fired without provocation, we hold that Officer Walker is not responsible for the harm done by the blast from the robber's shotgun.
Because we do not find that the actions of Officer Walker, either prior to or during *763 the robbery, can form the basis for a finding of liability for plaintiffs' harm, we must reverse the judgment of the trial court. Having reached this result we need not discuss the issues raised by defendant concerning the trial court's instructions to the jury.
Accordingly, the judgment is reversed and plaintiffs' case is dismissed.
REVERSED.